ACCEPTED
03-14-00608-CV
3711086
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/9/2015 11:35:00 AM
JEFFREY D. KYLE
CLERK

**NO. 03-14-00608-CV**

IN THE
COURT OF APPEALS FOR THE
THIRD SUPREME JUDICIAL DISTRICT
AT AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/9/2015 11:35:00 AM
JEFFREY D. KYLE
Clerk

---

**LINDA NOWLIN, APPELLANT**

**V.**

**LORI KEATON, APPELLEE**

---

APPEAL OF CAUSE C-1-CV-14-006938
FROM THE COUNTY COURT AT LAW #1
OF TRAVIS COUNTY, TEXAS

---

**APPELLANT'S BRIEF**

---

DAVID NOWLIN
ATTORNEY FOR APPELLANT

7301 RR 620 North, Ste. 155, 319
Austin, Texas 78726-4537
Telephone:    (512) 468-4882
Email:        DavidNowlin@me.com

NO ORAL ARGUMENT REQUESTED

## IDENTIFICATION OF THE PARTIES AND COUNSEL

Appellant certifies that the following is a complete list of the parties, attorneys, and all other interested persons regarding this matter:

1. **The Appellant in this case is:**      **Linda Nowlin**
Nowlin Properties
7301 RR 620 North, Ste. 155, 319
Austin, Texas 78726-4537

2. **Appellant was represented at trial and on appeal by:**      **David Nowlin**
Nowlin Properties
7301 RR 620 North, Ste. 155, 319
Austin, Texas 78726-4537

4. **The Appellee in this case is:**      **Lori Keaton**
The Giving Tree Learning Center
15102 Cavalier Canyon Drive
Lakeway, Texas 78734

5. **Appellee was represented at trial and on appeal by:**      **Robby Abarca**
Attorney at Law
P.O. Box 152547
Austin, Texas 78715

## NOTATION AS TO THE FORM OF CITATION

Citation in this brief will be as follows:

(a)     Citation to the Reporter's Record (R) will be to volume and page number, *e.g.*, "2R12" refers to page 12 of the second volume of the Reporter's Record and "SR12" refers to the same page of the supplemental volume.

(b)     Citation to the single-volume Clerk's Record (CR) will be to page number only, *e.g.*, "CR15" refers to page 15 of the Clerk's Record.

(c)     Citation to the Plaintiff's and Defendant's Exhibits (PX and DX respectively) will be to exhibit and page number, e.g., "2PX1" refers to page 1 of Plaintiff's Exhibit #2. All exhibits in evidence are located, in the third volume of the Reporter's Record.

# TABLE OF CONTENTS

Title Page..................................................................................................i

Identification of the Parties and Counsel.................................................ii

Notation as to the Form of Citation.......................................................iii

Table of Contents................................................................................iv

Index of Authorities.............................................................................vi

Statement of the Case.........................................................................viii

Points of Error......................................................................................ix

Statement of Facts.................................................................................1

Summary of Argument...........................................................................7

Argument............................................................................................10

   I.     The Trial Court Erred in Refusing to Submit to the Jury Appellant's
         Questions Regarding Past Due Rent or to Enter Judgment that
         Appellee Owed Appellant Rent, Attorney Fees and Costs of Court........10

       A.     Appellant Was Entitled to Past Due Rent in the Amount of
             $4,200.00 for July and August of 2014 as a Matter of Law...............11

       B.     Appellant's Challenge to the Jury Charge and the Questions Posed
             for the Jury's Consideration was Properly Preserved........................14

       C.     Appellant Was Entitled to a Jury Determination on the Issue of
             Past Due Rent....................................................................................17

       D.     Appellant Was Entitled to a Judgment in Her Favor for Her
             Reasonable Attorney Fees and Costs of Court...................................18

II.    The Trial Court Erred When it Refused to Submit to the Jury Appellant's Questions Relating to Appellee's Late Payment of Rent or to Enter Judgment that Appellee Breached the Lease by Failing to Pay Rent On Time.................................................................21

    A.    The Issues Presented herein, Including the Issue of Appellant's Right to Possession of the Property, Are Not Moot...........................21

    B.    Appellant Was Entitled to Judgment as a Matter of Law that Appellee Breached the Lease by Failing to Pay Rent for July of 2014 On or Before July 1, 2014......................................................27

    C.    The Jury Verdict on the Issue of Late Payment of Rent was Unsupported by the Evidence............................................................34

III.    The Trial Court Erred When it Refused to Submit to the Jury Appellant's Questions Relating to Appellee's Refusal of Access or to Enter Judgment that Appellee Breached the Lease by Refusing Access for Maintenance and Repair......................................................37

    A.    Appellant Was Entitled to Judgment as a Matter of Law that Appellee Breached the Lease by Refusing Peaceful Entry to Perform Maintenance and Repair......................................................37

    B.    The Jury Verdict on the Issue of Refusal of Peaceful Entry to Perform Maintenance and Repair was Unsupported by the Evidence..............................................................................................42

IV.    The Trial Court Erred When the Presiding Judge Demonstrated Bias Against and Hostility and Animosity Toward Appellant and Her Claims at Trial...........................................................................................44

Prayer.................................................................................................................48

Certificate of Service.........................................................................................49

Certificate of Compliance..................................................................................49

Appendix............................................................................................................50

# INDEX OF AUTHORITIES

## Cases

### *Texas Supreme Court*

*Amoco Production Co. v. Alexander*,
622 S.W.2d 563 (Tex. 1981)................................................................................10

*Barr v. Resolution Trust Corp.*,
837 S.W.2d 627 (Tex. 1992)................................................................................23

*Coker v. Coker*,
650 S.W.2d 391 (Tex. 1983)............................................................................32, 40

*Dow Chemical Co. v. Francis*,
46 S.W.3d 237 (Tex. 2001)..................................................................................11

*In Re Daredia*,
317 S.W.3d 247 (Tex. 2010)................................................................................24

*Lehmann v. Har-Con Corp.*,
39 S.W.3d 191 (Tex. 2001)..................................................................................24

*Marshall v. Housing Auth. City San Antonio*,
198 S.W.3d 782 (Tex. 2006)...........................................................21, 22, 24, 25, 27

*National Collegiate Athletic Ass'n v. Jones*,
1 S.W.3d 83 (Tex. 1999)....................................................................................22

*Prudential Ins. v. Financial Review Servs.*,
29 S.W.3d 74 (Tex. 2000)...................................................................................10

*State Dept. Highways v. Payne*,
838 S.W.2d 235 (Tex. 1992)................................................................................14

*Tiller v. McLure*,
121 S.W.3d 709 (Tex. 2003).................................................................................10

*Williams v. Lara*,
52 S.W.3d 171 (Tex. 2001)..................................................................................22

*Texas Courts of Appeals*

*Rice v. Pinney*,
51 S.W.3d 705 (Tex.App.—Dallas 2001, no pet.).....................................10, 23, 26

*Shaw v. Greater Houston Transp. Co.*,
791 S.W.2d 204 (Tex.App.Corpus.Christi,1990, no pet.).......................................44

*Straus v. Kirby Court Corp.*,
909 S.W.2d 105 (Tex.App.—Houston (14 Dist.) 1995, writ denied).........13, 28, 30

*Williams v. Bank of New York Mellon*,
315 S.W.3d 925 (Tex. App.—Dallas 2010, no pet.)..............................................21

*Unpublished Opinions*

*McElroy v. Teague Housing Authority*,
No. 10-10-00009-CV (Tex.App.—Waco 2012, no pet.)........................................26

*Pecan Valley Golf Apartments v. Moreland*,
No. 04-10-00421-CV (Tex.App.—San Antonio 2011).............................13, 30, 31

**Statutes**

TEX. PROP. CODE ANN. § 24.002 (Vernon 2009).....................................................10

TEX. PROP. CODE ANN. § 24.0051 (Vernon 2009)............................................11, 22

TEX. PROP. CODE ANN. § 24.006 (Vernon 2009).............................................18, 22

TEX. PROP. CODE ANN. § 24.008 (Vernon 2009)....................................................21

**Rules**

TEX.R.APP.PROC. 43.2(c)..................................................................................11

TEX.R.APP.PROC. 43.3........................................................................................11

TEX.R.CIV.PROC. 273..........................................................................................14

TEX.R.CIV.PROC. 276..........................................................................................15

TEX.R.CIV.PROC. 301..........................................................................................10

TEX.R.CIV.PROC. 510.11.......................................................................................11

TEX.R.CIV.PROC. 746 (repealed)..........................................................................21

## STATEMENT OF THE CASE

Appellant filed her suit for forcible detainer (herein referred to alternately as "eviction") in Travis County Justice Court #2 on June 6, 2014. 2R71, CR30. In her petition, Appellant pled damages for "all rents … according to the lease dated 5/1/14". CR30. Additionally, she indicated that attorney fees and court costs were sought in unspecified amounts. Id. On July 2, 2014, judgment was rendered in favor of Appellee. CR11. On or about July 23, 2014, Appellant appealed from that judgment to the Travis County Court at Law #1. CR5.

On August 25, 2014, this cause came to be heard in County Court at Law #1, for trial by jury, which returned a verdict in Appellee's favor. CR144-CR147. On August 28, 2014, Appellant moved the County Court to render judgment notwithstanding the jury's verdict, to grant a new trial and to issue written rulings on her proposed jury questions. CR153-CR175. On September 17, 2014, the court denied all post-judgment motions and rendered judgment in favor of Appellee that Appellant take nothing, noting specifically that Appellant was not entitled to collect the rent in arrears for July and August of 2014. SR5, SR10-SR12, CR176.

Appellant filed her notice of appeal on September 22, 2014, and this appeal ensued. CR177.

# POINTS OF ERROR

I.    The Trial Court Erred in Refusing to Submit to the Jury Appellant's Questions Regarding Past Due Rent or to Enter Judgment that Appellee Owed Appellant Rent, Attorney Fees and Costs of Court.

    A.    Appellant Was Entitled to Past Due Rent in the Amount of $4,200.00 for July and August of 2014 as a Matter of Law.

    B.    Appellant's Challenge to the Jury Charge and the Questions Posed for the Jury's Consideration was Properly Preserved.

    C.    Appellant Was Entitled to a Jury Determination on the Issue of Past Due Rent.

    D.    Appellant Was Entitled to a Judgment in Her Favor for Her Reasonable Attorney Fees and Costs of Court.

II.   The Trial Court Erred When it Refused to Submit to the Jury Appellant's Questions Relating to Appellee's Late Payment of Rent or to Enter Judgment that Appellee Breached the Lease by Failing to Pay Rent On Time.

    A.    The Issues Presented herein, Including the Issue of Appellant's Right to Possession of the Property, Are Not Moot.

    B.    Appellant Was Entitled to Judgment as a Matter of Law that Appellee Breached the Lease by Failing to Pay Rent for July of 2014 On or Before July 1, 2014.

    C.    The Jury Verdict on the Issue of Late Payment of Rent was Unsupported by the Evidence.

III.  The Trial Court Erred When it Refused to Submit to the Jury Appellant's Questions Relating to Appellee's Refusal of Access or to Enter Judgment that Appellee Breached the Lease by Refusing Access for Maintenance and Repair.

    A.    Appellant Was Entitled to Judgment as a Matter of Law that Appellee Breached the Lease by Refusing Peaceful Entry to Perform Maintenance and Repair.

B.      The Jury Verdict on the Issue of Refusal of Peaceful Entry to Perform Maintenance and Repair was Unsupported by the Evidence.

IV.     The Trial Court Erred When the Presiding Judge Demonstrated Bias Against and Hostility and Animosity Toward Appellant and Her Claims at Trial.

## STATEMENT OF FACTS

## 1. The Lease

On April 12, 2014, Linda Nowlin (hereinafter named "Appellant") and Lori Keaton (hereinafter named "Appellee") created a Residential Lease Contract (hereinafter named "the Lease") for the rental of residential real property located at 3907 Eck Lane, Austin, Texas 78734. 1PX1, 2R27. The Lease became effective on May 6, 2014.[1] It grants to Appellee the right to possess and occupy the subject property only so long as she pays rent for its use and she abides by certain enumerated and specific rules and prohibitions. 1PX1.

In Section 6, "Rent and Charges," the Lease provides that rent for the property will be "$2100" per month, "in advance and without demand." 1PX1. In that same section, the Lease provides that, in the absence of other arrangements that were not made by the parties, "…[Appellee] must pay [her] rent on or before the 1st day of each month (due date) with no grace period[,]" and that "[Appellee] must not withhold or offset rent unless authorized by statute." Id, 2R32. In that same section, the Lease provides that, "If [Appellee does] not pay rent on time, [she will] be in default and all remedies under state law and this Lease Contract will be authorized." 1PX1. In that same section, the Lease pro-

---

[1] It was scheduled when written to become effective on May 1, 2014. 1PX1. Appellee was already in residence at the subject property under a prior lease executed with the previous owner. 2R44. Appellant purchased the property from that owner and the transaction did close until May 6, 2014, causing the effective date of the Lease to be delayed until May 6, 2014. 2R27.

vides that certain late charges may be assessed if rent is paid late after the third day of the month.  Id.

In Section 20, "Prohibited Conduct," the Lease provides that Appellee "may not engage in the following activities[,]" including, "disturbing or threatening the rights, comfort, … or convenience of others (including [Appellant and her] agents and employees)[.]"  1PX2.

In Section 28, "When We May Enter," the Lease provides that Appellant and certain agents "may peacefully enter the dwelling at reasonable times" for certain purposes including, "making repairs or replacements; estimating repair or refurbishment costs; … [and] doing preventative maintenance[.]"  1PX4.

In Section 32, "Default by Tenant," the Lease provides that Appellee will "be in default if: (1) [she does not] pay rent … on time; [or Appellee] or any guest or occupant violates this Lease Contract [or Appellant's] rules[.]"  Id.  In that same section, the Lease provides that, if Appellee defaults, Appellant "may end [her] right of occupancy by giving [her] a 24-hour written notice to vacate." Id.  Finally, in that same section, the Lease provides that in the event that default on the Lease leads to litigation, the "prevailing party may recover reasonable attorney's fees and other litigation costs from the non-prevailing parties," and that Appellant "may recover attorneys' fees in connection with enforcing [her] rights under this Lease Contract."  Id.

2

## 2. Initial Friction

Prior to the effective date of the Lease and incident to the closing of the transaction for the sale of the property, a professional inspection of the structure was performed and an inspection report was created. 2R42. The inspection report recommended a multitude of repairs to the house, including repairs relating to structural and electrical defects, heating and air conditioning, plumbing and septic systems and other safety issues. 2R42-2R43. The previous owner was an "absentee landlord" who lived out of state and seldom performed maintenance on the property and failed to keep it in good repair. 2R44-2R45. Incident to or soon after the sale, Appellant was timely informed of the condition of the house and the need for repairs and maintenance. 2R42.

After a short initial period of compliance (less than two weeks in length), Appellee began to resist Appellant's attempts to enter and repair the property. 2R48-2R49, 2R128-2R129. During that initial period, Appellant entered the property to perform repairs a total of four times on or about May 7, 12, 14 and 16 of 2014. 2R115-2R118. Each of these visits was made at a reasonable time, during normal business hours on weekdays. Id, 2R47. Appellant sought and received Appellee's consent to entry on each occasion, prior to visiting the property, giving at least twenty-four hours' notice. 2R47.

On May 19, 2014, Appellee hand delivered to Appellant a letter, in which she complained that "the frequency of [Appellant's] visits and intrusions [was] becoming excessive[.]" 9P1, 2R48-2R49. In that letter she informed Appellant that she had attempted to research the legality of Appellant's requests for entry and that she had formed the legal opinion that Appellant was permitted under applicable law to enter to perform only those repairs that address issues having to do with "the integrity of the property" or issues compromising her "safety and security". Id. She further stated therein that requests for entry for other reasons "intrude[d] on [her] right to privacy and [her] right to peace and quiet." Id.

### 3. Resistance

On May 27, 2014, after giving advance notice and receiving consent to enter and make repairs, Appellant visited the house again with a contractor in order to clean air conditioner coils at Appellee's request and to perform other repairs to the property. 2R59-2R61. Appellee answered the door in an indecent state, wearing no clothing at all and exposing herself to Appellant and her agent contractor. 2R62. Appellee made this exhibition with the purpose and intent to embarrass Appellant, to disturb her comfort and to frustrate and to offer resistance to her attempts to make repairs on that day and in the future. 2R62-2R63, 2R130-2R134.

On June 4, 2014, Appellant posted her first notice to vacate for breach of the Lease, alleging that Appellee was in default as a result of her resisting and attempting to thwart and frustrate Appellant's attempts to repair the property and her intentionally disturbing the comfort and convenience of Appellant and her agent. 2R87-2R88. At that time, in accordance with Appellant's requests that repairs be postponed, Appellant made only two requests to enter the residence between the date the notice was posted and the trial on the merits in County Court at Law #1. 2R63-2R65, 2R125.

The second such request was made on July 28, 2014, by email. 19PX1. In that email, Appellant gave Appellee advance notice that contractors were scheduled to visit the property the following day, July 29, 2014, to perform preventative termite treatment. Id. Appellee responded by expressly refusing Appellant and her agents entry, stating "I will not accommodate your demand to enter the house tomorrow whatsoever," and demanding that Appellant cease contacting her again for reasons other than two listed purposes, neither of which was related to the performance of maintenance, the making of repairs or any of the many other legitimate reasons Appellant was entitled to contact her under the terms of the Lease. Id, 2R66. Following this refusal, Appellant canceled the termite treatment and all other planned repairs and maintenance. 2R67.

## 4. Delinquent Rent

Appellee was first required to make payment of rent to Appellant on June 1, 2014, in the amount of $2,100.00 for the month of June and $80.00 for the month of May, totaling $2,180.00.  2R27-2R29.  Appellee made no payment on June 1, 2014, or on June 2, 2014.  2R33.  Appellant transmitted to Appellee a late payment notice on June 3, 2014,[2] reiterating that under the Lease rent was due on the first of the month, informing her that her rent for June was delinquent and warning her that failure to pay rent on or before the due date would constitute default under the terms of the Lease.  2R34, 16PX1.  Appellee made her payment of June's rent on June 3, 2014.  2R34.

Appellee was next scheduled to make payment of rent to Appellant on July 1, 2014, in the amount of $2,100.00 for the month of July.  2R38-2R39.  Appellee made no payment and no attempt to make payment on July 1, 2014, or July 2, 2014.  2R39, 2R105.  On July 2, 2014, Appellant requested of her banking institution that her deposit account be made inaccessible to Appellee, effectively refusing to accept late payment of rent.  2R41.  On that same day, Appellant posted a second notice to vacate for non-payment of rent.  2R39.

---

[2] Testimony is unclear on the date of the late notice, but the notice itself is dated June 3, 2014. *See* 2R34, 2R86; 16PX1.

Appellee never paid rent again after June 3, 2014, and was in arrears in the amount of $4,200.00, for the months of July and August of 2014, at the time of the trial on the merits in County Court at Law #1. 2R76.

## SUMMARY OF ARGUMENT

Though the evidence was clear that Appellee owes to Appellant a debt of $4,200.00 for past due, unpaid rent for the months of July and August of 2014, the trial court erred by refusing to submit to the jury Appellant's proposed jury questions relating to the rent arrearage, by entering a take nothing judgment based upon the jury's verdict that was unsupported by the evidence and by refusing to enter judgment as a matter of law that the debt was due and owing. Because Appellee was entitled to a judgment in her favor regarding the debt, she was also entitled to a judgment as a matter of law for her reasonable attorney fees incurred in enforcing her rights under the Lease and for her costs of court.

Appellant's challenge to the questions submitted to the jury in the jury charge was properly preserved because Appellant timely submitted her proposed questions to the court prior to the reading of the charge to the jury and multiple times requested a ruling on her proposed questions, and the trial court erred by failing to endorse her written questions with the presiding judge's rejection of

those questions and his signature as required by the Texas Rules of Civil Procedure.

Though the evidence was clear that Appellee breached the terms of the Lease by failing to pay rent due on July 1, 2014, on or before July 1, 2014, the trial court erred by refusing to submit to the jury Appellant's proposed jury questions relating to the delinquency of July's rent, by entering a take nothing judgment based upon the jury's verdict that was unsupported by the evidence and by refusing to enter judgment as a matter of law that the Lease was breached. The issue of Appellant's right to immediate possession at the time of trial is not moot, though Appellee has vacated the property, because a live controversy exists between the parties regarding Appellant's right to recover from Appellee her reasonable attorney fees incurred in seeking possession, which controversy cannot be resolved unless the issue of Appellant's right to possession is resolved.

Though the evidence was clear that Appellee breached the terms of the Lease by failing to provide to Appellant access to the property for the purposes of performing preventative maintenance and making repairs, the trial court erred by refusing to submit to the jury Appellant's proposed jury questions relating to Appellee's denial of peaceful entry for those purposes, by entering a take nothing judgment based upon the jury's verdict that was unsupported by the evi-

dence and by refusing to enter judgment as a matter of law that the Lease was breached.

The presiding judge of the trial court, consistently throughout the trial, demonstrated bias against Appellant, her claims and her attorney; showed animosity and hostility toward the same, both in and out of the presence of the jury; and, by doing so, poisoned the well, invited the jury to substitute his judgment for its own and deprived Appellant of a fair trial.

# ARGUMENT

## I. THE TRIAL COURT ERRED IN REFUSING TO SUBMIT TO THE JURY APPELLANT'S QUESTIONS REGARDING PAST DUE RENT OR TO ENTER JUDGMENT THAT APPELLEE OWED APPELLANT RENT, ATTORNEY FEES AND COSTS OF COURT.

The appropriate action to determine the right of possession of real property is a suit for forcible detainer. TEX. PROP. CODE ANN. § 24.002, *Rice v. Pinney*, 51 S.W.3d 705, 709 (Tex.App.—Dallas 2001, no pet.). A person commits a forcible detainer if she refuses to surrender possession of real property on demand while willfully and without force holding over after the termination of her right of possession. TEX. PROP. CODE ANN. § 24.002(a)(1).

In relationships between lessors and lessees, the terms of the lease are contractual obligations and determine the rights and duties of the parties thereto, including the right of possession. *Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 571 (Tex. 1981). The Lease grants to Appellee the right to possess and occupy the subject property only so long as she pays rent for its use and she abides by certain enumerated and specific rules and prohibitions. 1PX1, 1PX4.

A trial court may enter judgment notwithstanding the verdict of a jury if a directed verdict would have been proper or if the jury makes findings that have no support in the evidence. TEX.R.CIV.PROC. 301, *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003). The court may direct a verdict if no probative evidence raises a genuine issue of fact for jury consideration. *Prudential Ins. v. Financial*

*Review Servs.*, 29 S.W.3d 74, 77 (Tex. 2000). When a trial court's judgment on a matter of law is in error, the Court on appeal should reverse the judgment and render the judgment that the trial court should have rendered. TEX.R.APP.PROC. 43.2(c).

Rendition is appropriate when reversing the judgment of the trial court unless a remand is necessary for further proceedings or the interests of justice require that a new trial be held. TEX.R.APP.PROC. 43.3. A jury verdict may be set aside and a new trial ordered where the evidence supporting the verdict was so weak, or where the verdict was so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).

### A. Appellant Was Entitled to Past Due Rent in the Amount of $4,200.00 for July and August of 2014 as a Matter of Law

A landlord may recover unpaid rent in an eviction action. TEX. PROP. CODE ANN. § 24.0051(b). The appellant in an eviction action is permitted to plead, prove and recover damages incurred during the pendency of an appeal to county court, including loss of rents during the pendency of the appeal, attorney fees and court costs. TEX.R.CIV.PROC. 510.11.

In Section 6, "Rent and Charges," the Lease provides that rent for the property will be "$2100" per month. 1PX1. Appellant asserted in her petition

that Appellee owed her unpaid rent for time spent in possession beginning in July of 2014, and she presented evidence at trial that the total amount of unpaid rent was $4,200.00 and that it was due and owing prior to the date of trial. 2R30, 2R76. Appellant testified and Appellee admitted that Appellee was in possession of the property from the effective date of the Lease, May 6, 2014, through the date of trial, August 25, 2014. 2R26-2R27, 2R98. Appellee also indicated to the court, after trial, that she did not relinquish possession until September 5, 2014. SR9. Appellant testified and Appellee did not dispute that when Appellee failed to pay rent on time for the month of July of 2014, Appellant placed a hold on her deposit account preventing Appellee from tendering late rent by that method. 2R41.

It appears to be Appellee's position and the position of the trial court that she cannot be held liable for failing to pay rent in July because the hold was placed on the account only one day after the rent was due and payment was, therefore, impossible. 2R89, SR5. This is not actually the case. It is true that the Lease specifies that payment is to be made by specific means, deposit into Appellant's deposit account, but it is not true that it was *impossible* to make payment by other means, such as mailing Appellee a check or money order, or tendering payment by other negotiable instrument, or even cash. It was also possible for Appellee to preserve her argument that rent was timely tendered by

12

paying the disputed sums into the registry of the court during the pendency of the appeal to County Court #1. Finally, failing even that, she should have tendered the past due rents to Appellant in court in the presence of the presiding judge at trial or during one of the pretrial conferences. That she did not even attempt to do any of these things precludes her from arguing on appeal that it was impossible for her to pay the rents due under the Lease.

However, even if the Court is convinced that it was impossible for her to pay rent to Appellant when she attempted to do so, Appellant's refusing to accept it late during the pendency of the eviction action does not constitute waiver or forgiveness of the debt and should not be construed as such. The waiver of a right must be made by a clear, intentional relinquishment of that right and must be clearly proven. *Straus v. Kirby Court Corp.*, 909 S.W.2d 105, 108, 109 (Tex.App.—Houston (14 Dist.) 1995, writ denied). Nothing in the Lease obligates Appellant to accept rent three days late, or even one day late. 1PX1-1PX6, 2R41. Accepting a late payment of rent is often argued to constitute waiver of the issue of the breach of that term of the Lease on that occasion and is sometimes argued to be waiver of the right to receive timely payment at all on future occasions. *See Pecan Valley Golf Apartments v. Moreland*, No 04-10-00421-CV (Tex.App.—San Antonio 2011) (not designated for publication), *Straus*, at 107.

Appellant's refusal to accept late rent when it was tendered on July 3, 2014, was not intended to be a waiver of her right to receive rent for that month but was merely the safest avenue available to her to preserve her right under the Lease to end Appellee's right of occupancy for failing to pay rent on or before the due date, as required by the Lease. Therefore, because Appellant testified that Appellee owes her a debt of $4,200.00 and Appellee failed to dispute the evidence of this debt, no genuine issue of fact existed for submission to the jury and Appellant was entitled to a judgment in her favor on the issue of rent damages as a matter of law.

## B. Appellant's Challenge to the Jury Charge and the Questions Posed for the Jury's Consideration was Properly Preserved.

The standard for determining whether or not error in the jury charge is preserved for appellate review is "whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *State Dept. Highways v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992). Appellant was entitled to an opportunity to present to the trial court questions for the jury's consideration and to request that those questions be included in the jury charge. TEX.R.CIV.PROC. 273. Appellant was entitled to a ruling on any such questions so presented, which ruling was required to be made by the presiding judge's written endorsement of refusal and signature on the document containing the requests.

14

TEX.R.CIV.PROC. 276. A document so endorsed "shall constitute a bill of exceptions, and it shall be conclusively presumed that the party asking the same presented it at the proper time, excepted to its refusal or modification, and that all the requirements of law have been observed, and such procedure shall entitle the party requesting the same to have the action of the trial judge thereon reviewed without preparing a formal bill of exceptions." Id.

On August 25, 2014, immediately prior to trial on the merits, the parties convened at the court to discuss proposed questions for the jury's consideration.[3] The court made an oral ruling rejecting all of Appellant's postposed questions and substituting its own to be included in the jury charge.[4] After the charge was prepared and submitted to the parties, Appellant and counsel reasonably believed that the court had already ruled on her proposed questions and rejected them, and, therefore, did not make a second identical submission of a document that was already in the record. SR8.

After trial, Appellant, in her Plaintiff's Motion for Ruling on Plaintiff's Proposed Jury Questions requested written rulings on the questions submitted.

---

[3] Appellant, through her attorney, reminded the court that proposed questions were submitted by Appellant at the pre-trial conference immediately prior to trial. SR8. Neither the court nor Appellee challenged the statement. Id. The proposed questions were included in the Clerk's Record. CR141.

[4] The court reporter was not present at the conference, but the court's rejection of Appellant's proposed questions and substitution of alternate questions can be necessarily inferred from the fact that Appellant's questions were not included in the charge, but others were. CR145-CR146.

CR151.  The court denied the motion and refused to issue individual rulings. SR12.  However, neither the court nor Appellee contradicted in any way that Appellant had timely submitted her proposed questions prior to the reading of the charge to the jury.

The court erred when the presiding judge failed to endorse Appellant's proposed questions and to sign the document on which they were requested. The court was requested to correct that error by issuing the written rulings to which Appellant was entitled after the trial and it refused to do so.  But for the court's initial error in declining to issue written rulings as required by the Texas Rules of Civil Procedure, the document would constitute an adequate bill of exception.  Appellant was not in a position to know that the court had failed to make its required written endorsements until after trial and when the court was asked to correct the error in the record, it refused.

Therefore, Appellant has satisfied the requirements for preserving error in the jury charge by multiple times timely and plainly making the trial court aware of her complaints and obtaining the only ruling the court was willing to give on the issue in response to her repeated requests.

## C. Appellant Was Entitled to a Jury Determination on the Issue of Past Due Rent.

Jury Question Number Two was submitted to the jury following the close of all evidence, asking, in relevant part, "Did [Appellee] fail to comply with the lease by failing to pay her rent in a timely manner?" CR146. It did not ask, and no question presented to the jury for consideration in the Jury Charge asked whether or not Appellee owed to Appellant delinquent rent, separate and apart from the question of whether or not Appellee breached the Lease by failing to make timely payment of rent. The jury could not have given an answer in the space provided that was intended to convey a finding that while Appellee did not fail to pay her rent in a timely manner, she did owe a rent arrearage for time spent in possession of the property. CR146.

Appellant was entitled to a determination on this issue and, seeking such a determination, submitted jury questions #8, #8A and #8B for inclusion in the Jury Charge, the answers to which would have made clear the jury's verdict on the issue of rent arrearage, separate and apart from the issue of breach of the Lease by late payment of rent.[5] Therefore, the court erred in rejecting Appellant's

---

[5] Specifically, Appellant proposed that the jury be asked if Appellee was "in arrears on rent for July and August, 2014[,]" if Appellee was "liable to [Appellant] for $2,100.00 in rent for the month of July of 2014[,]" and if Appellee was "liable to [Appellant] for $2,100.00 in rent for the month of August of 2014[.]" CR142.

questions and failing to include in the Jury Charge any question capable of resolving the issue of rent arrearage.

However, even if the question, as presented, was adequate to allow the jury to render a verdict on the issue of rent arrearage, the jury gave an answer thereto that was wholly unsupported by the evidence submitted for its consideration. Because Appellant testified that Appellee owes her a debt of $4,200.00, and Appellee failed to dispute the evidence of this debt, the evidence of the debt was overwhelmingly in favor of Appellant and the jury rendered a verdict that was contrary to the great weight and preponderance of all relevant evidence on the issue of whether or not Appellee owed rent in the amount of $4,200.00, cumulatively, for the months of July and August of 2014. Because the jury rendered a verdict on the issue of rent arrearage that is contrary to the great weight and preponderance of all relevant evidence and because the trial court issued a take nothing judgment based upon that verdict, the court erred, the error is reversible and Appellant is entitled to a new trial.

### D. Appellant Was Entitled to a Judgment in Her Favor for Her Reasonable Attorney Fees and Costs of Court.

A landlord is entitled to recover attorney fees in a suit for forcible detainer, "[i]f a written lease entitles the landlord to recover attorney's fees[.]" TEX. PROP. CODE ANN. § 24.006(b). Additionally, "[t]he prevailing party [in such a

suit] is entitled to recover all costs of court." TEX. PROP. CODE ANN. § 24.006(d).

In Section 32. "Default by Resident," the Lease provides that in the event of Appellee's default on the Lease, Appellant "may recover attorneys' fees in connection with enforcing [her] rights under this Lease Contract." 1PX4.

Jury Question Number Three was submitted to the jury following the close of all evidence, asking, "What is a reasonable fee for the necessary services of [Appellant]'s attorney for preparation and trial in this case, stated in dollars and cents?" CR146. Though the jury rendered a verdict in Appellee's favor on the two questions relating to breaches of the Lease, it answered Question Three with a dollar amount of "$2300.00[.]" Id. This answer is wholly unsupported by the evidence submitted for the jury's consideration.

Appellant testified to paying "over $4,000.00" to trial counsel and "about a thousand" to another attorney and to receiving free legal work from a third. 2R76. Trial counsel testified to having been paid $4,600.00 on the matter. 2R93.[6] No evidence was presented by Appellee and nothing exists in the record to support a finding that the fees paid to Appellant's attorneys were in any way unreasonable. Also, that no evidence exists in the record regarding the amount

---

[6] It is a necessary implication of this testimony that the number cited does not cover all the work performed on the case, as work was being done at that time and after it on the record. Additionally, this sum does not include work on post-judgment motions and appeal.

Appellant expended in court costs is due to court's stopping her attorney, on its own objection, from eliciting that evidence at trial. 2R75.

Because judgment should have been rendered as a matter of law in Appellant's favor on the issue of rent arrearage[7] and on the issue of possession,[8] she is entitled as a matter of law to her reasonable attorney fees and costs of court, including pre- and post-judgment interest. But even if a jury determination is required regarding what amount of fees is reasonable, the evidence of Appellant's reasonable attorney fees was overwhelmingly in favor of Appellant and the jury rendered a verdict that was contrary to the great weight and preponderance of all relevant evidence on the issue. Because the jury rendered a verdict on the issue of Appellant's reasonable attorney fees that is contrary to the great weight and preponderance of all relevant evidence and because the trial court issued a take nothing judgment based upon that verdict, the court erred, the error is reversible and Appellant is entitled to a new trial.

Additionally, Appellant's attorneys have continued to work on this matter since trial and have incurred additional fees that could not have been included in the evidence presented to the jury. Therefore, even if the Court renders judgment in favor of Appellant on the issue of rent arrearage or on either of the issues relating to her right to possession of the property without the need for new

---

[7] *See supra*, §§I(A)-I(C).
[8] *See infra*, §§II-III.

trial on those issues, Appellant is entitled to a new trial on fees alone to determine the total amount of reasonable attorney fees incurred in connection with enforcing her rights under the Lease.

## II. THE TRIAL COURT ERRED WHEN IT REFUSED TO SUBMIT TO THE JURY APPELLANT'S QUESTIONS RELATING TO APPELLEE'S LATE PAYMENT OF RENT OR TO ENTER JUDGMENT THAT APPELLEE BREACHED THE LEASE BY FAILING TO PAY RENT ON TIME.

### A. The Issues Presented Herein, Including the Issue of Appellant's Right to Possession of the Property, Are Not Moot.

A forcible detainer action is intended to be a speedy, simple and inexpensive means to obtain immediate possession of property. *Marshall v. Housing Auth. City San Antonio*, 198 S.W.3d 782, 787 (Tex. 2006), TEX. PROP. CODE ANN. § Ch. 24, Pt V (generally). It is not intended to be a final determination of whether or not an eviction is wrongful. *Marshall*, at 787, (citing TEX. PROP. CODE ANN. § 24.008). The only issue to be determined relating to the right of litigants to the property in question is the issue of immediate possession. *Williams v. Bank of New York Mellon*, 315 S.W.3d 925, 926 (Tex. App.—Dallas 2010, no pet.), *see also*, TEX.R.CIV.PROC. 746 (repealed). [9]

---

[9] Rule 746 was repealed in 2013, but *Williams* and similar cases make similar statements relating to immediate possession's being the sole issue in forcible detainer actions and it is not sufficiently clear that the language in question is no longer good law that it could be left unaddressed.

An appellate court is prohibited from deciding moot controversies. *National Collegiate Athletic Ass'n v. Jones*, 1 S.W.3d 83, 86 (Tex. 1999). A live controversy between the parties must exist at every stage of the proceedings, including the appeal, or the case is moot. *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001). A tenant's appeal of an adverse judgment on the issue of possession becomes moot when the tenant gives up possession if the term of the lease has expired and the tenant, therefore, retains no "potentially meritorious claim of right to current, actual possession of the [property]." *Marshall*, at 787. When the issue of possession is moot on appeal, the appellate court should vacate the trial court's judgment on that issue. *Marshall*, at 785.

However, though Texas Rule of Civil Procedure 746 stated, when it was in force, that possession is the sole issue in a forcible detainer action, the Property Code makes clear that other issues, not relating to the litigants' rights to the property, may be joined, including whether or not the tenant owes unpaid rent and attorney fees. TEX. PROP. CODE ANN. §§ 24.0051, 24.006. A landlord may recover unpaid rent in an eviction action "regardless of whether the tenant vacated the premises after the date the landlord filed the sworn statement and before the date the court renders judgment." TEX. PROP. CODE ANN. § 24.0051(b). Therefore, when the Rule and courts interpreting the Rule have stated that possession is the only issue to be decided in a forcible detainer action, they must

mean that it is the only issue relating to the parties' rights to the property, and not that the other allowable ancillary issues may not be decided. *See Rice*, at 709-713 (discussing Rule 746's mandate that the only issue in a forcible detainer action is possession as a provision designed in specific opposition to the notion that title may be tried in such an action).

Such issues and claims that are pled and submitted for consideration and properly under the jurisdiction of the trial court, and then finally decided by the judgment of that court, are barred from reconsideration. *See Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 628-629 (Tex. 1992). Therefore, though a forcible detainer action does not in itself bar a separate or subsequent action for attorney fees or rent, the trial court's take nothing judgment in this case bars Appellant from filing a subsequent action to seek the damages pled and disposed of by the trial court.

Even if this matter was ever subject to confusion or interpretation in the instant case, it was specifically addressed by the trial court at the hearing on post-judgment motions. Appellant argued that the court should issue a judgment that stated that the jury had issued no verdict concerning whether or not Appellee owed Appellant unpaid rent, and did so argue specifically to preserve her right to bring a separate and subsequent action for that rent. SR5-SR9. The presiding judge stated from the bench that, "We asked the jury if she had failed to

pay her rent, and the jury said no." SR5. Though it was demonstrated that such a question was never asked of the jury, the trial court still declined to limit the judgment to the questions the jury actually considered and, instead, issued a Final Judgment that Appellant take nothing. SR5-SR9, CR145-CR146, CR176.

Additionally, the court's take nothing judgment stated specifically that "[t]his judgment finally disposes of all claims and parties and is appealable." CR176. The Texas Supreme Court has indicated that this exact language, when included in a judgment, leaves "no doubt about the court's intention" to render a final judgment on all such claims. *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 206 (Tex. 2001), *In Re Daredia*, 317 S.W.3d 247, 248 (Tex. 2010). As such, the judgment finally disposed of all of the claims before it, including Appellant's right to unpaid rent and attorney fees incurred in connection with enforcing her rights under the Lease. See Id.

Though the Supreme Court, in *Marshall*, ruled that the issue of possession was moot in a similar situation, its ruling on that issue is not applicable to the instant case. The reasoning in *Marshall* is based upon a situation in which the landlord prevailed at trial and the tenant appealed the judgment granting possession to the landlord, essentially, apparently, seeking to be let back in to the unit in question after vacating it and after the expiration of the lease term. *Marshall*, at 785-786. This is not the situation before the Court in this matter.

Though Appellee has vacated the property, the term of the lease has not expired and it was the tenant, and not the landlord, who was successful at trial. Additionally, Appellant's right to recover attorney fees incurred thus far in litigating this matter is contingent upon a correct determination on the issue of possession.[10] Appellant is not a tenant apparently hoping to retake possession of a vacated unit after the expiration of the lease, but rather a landlord seeking a determination that an undisputed debt of rent is owed to her and that she was entitled to possession at the time that she sought it and, consequently, that she is entitled to her attorney fees incurred in the seeking, as the Lease the Property Code agree is her right.

Also, the Court held in *Marshall* that even if an appellant gives up possession of the premises after the trial court signs a judgment of possession, the appeal may not be moot so long as (1) the appellant timely and clearly expresses her intent to appeal and (2) the appellate relief requested is "not futile; that is, so long as she held and asserted a potentially meritorious claim of right to current, actual possession of the [premises]." *Marshall*, at 787. In the instant case, Appellant timely and clearly expressed her intent to appeal the trial court's judgment and the appellate relief requested is not futile, since Appellant does still

---

[10] It is not clear that a judgment in Appellant's favor on the issue of rent arrearage would entitle Appellant to all of the attorney fees incurred in pursuing enforcement of her right to possession before Appellee ceased paying rent.

hold and assert a potentially meritorious claim of right to current and actual possession of the property.

Therefore, none of the issues before the Court is moot, and the Court has proper jurisdiction to decide all issues including the issue of possession, as a live controversy exists regarding attorney fees that can only be resolved if the issue of possession is resolved.

However, even if the Court is convinced that the issue of possession is moot, it may still consider ancillary issues independent of possession. *McElroy v. Teague Housing Authority*, No. 10-10-00009-CV (Tex.App.—Waco 2012, no pet.) (not designated for publication) (citing *Rice*, at 707).[11]  Therefore, the Court has proper jurisdiction to decide, at the least, the ancillary issues of Appellee's debt to Appellant of unpaid rent for the months of July and August of 2014 and Appellant's right to attorney fees and court costs.

However, even if the Court is convinced that it lacks jurisdiction to decide any of the substantive issues contained in this appeal, it should still vacate the trial court's judgment on all issues, and thereby allow Appellant to reassert her claims in a separate, subsequent action for rent, court costs and attorney fees,

---

[11] *McElroy* is an unpublished memorandum opinion without the force of law and is included in support of this proposition solely for its phrasing in framing the issue at hand.  Id, (stating "Although the issue of possession is moot, we may still review issues independent of possession.").

and any other damages still outstanding (including those that could not be joined to the initial forcible detainer action). *See Marshall*, at 785.

## B. Appellant Was Entitled to Judgment as a Matter of Law that Appellee Breached the Lease by Failing to Pay Rent for July of 2014 On or Before July 1, 2014.

In Section 6, "Rent and Charges," the Lease provides that rent for the property will be "$2100" per month, "in advance and without demand." 1PX1. In that same section, the Lease provides that, in the absence of other arrangements that were not made by the parties, "[Appellee] must pay [her] rent on or before the 1st day of each month (due date) with no grace period[,]" and that "[Appellee] must not withhold or offset rent unless authorized by statute." Id, 2R32. In that same section, the Lease provides that, "If [Appellee does] not pay rent on time, [she will] be in default and all remedies under state law and this Lease Contract will be authorized." 1PX1. Also in that section, the Lease provides that certain late charges may be assessed if rent is paid late after the third day of the month. Id.

In Section 32, "Default by Tenant," the Lease provides that Appellee will "be in default if: (1) [she does not] pay rent … on time; [or Appellee] or any guest or occupant violates this Lease Contract [or Appellant's] rules[.]" Id. In that same section, the Lease provides that, if Appellee defaults, Appellant "may

27

end [her] right of occupancy by giving [her] a 24-hour written notice to vacate." Id.

A lease is not altered or repudiated by a landlord's occasionally accepting late payment of rent. *Straus*, at 108. A landlord's "past indulgence" of a tenant's payment of rent a few days late does not, in itself, waive the landlord's right to receive rent on time under a lease. Id, at 109. "Waiver is an *intentional* relinquishment of a known right." Id (emphasis in original).[12]

Appellant testified and Appellee admitted that rent for the month of June was due on June 1, 2014, in the amount of $2,100.00, but was not tendered until June 3, 2014. 2R39, 2R105. Appellant testified and Appellee admitted that, in the late notice, Appellant reminded Appellee that, under the Lease Agreement, her rent was due on the first of the month, every month, with no grace period. 2R34, 2R143-2R144. Appellant testified and Appellee admitted that rent was next due on July 1, 2014, in the amount of $2,100.00, but was not received on

---

[12] Much of the language in *Straus* refers, specifically, to whether or not the facts being considered constituted a waiver of a non-waiver clause in the lease at issue. It is Appellant's position that the language is, nevertheless, broadly applicable to the waiver of any contractual right, but for the sake of clarity it should be noted that the Lease contains, in Section 32, "Default by Tenant," under the subheading "Eviction," a non-waiver clause that is virtually identical to the clause referenced in *Straus*. *See Straus*, at 107. The Lease provides, "After giving notice to vacate or filing an eviction suit, we may still accept rent or other sums due; the filing or acceptance doesn't waive or diminish our right of eviction, or any other contractual or statutory right. Accepting money at any time doesn't waive our right to damages; past or future rent or other sums; or to continue with eviction proceedings." 1PX4.

that day. 2R39, 2R105. Indeed, Appellee testified that her intention was to withhold rent during the pendency of the first eviction action.[13]

Her position now appears to be that it was her honest belief that rent was due on the third of the month.[14] Her testimony, though, belies that argument and makes clear that her decision to withhold rent in July was a calculated litigation strategy. Indeed, even if it was her honest belief that rent was due on the third, such a belief was not reasonable. The language of the Lease is clear that the due date was the first of the month. 1PX1. Additionally, even if she was mistaken, her mistake was corrected. She was sent and she did receive and read a warning stating clearly, again, that rent was due on the first of the month. Ignorance and misunderstandings of law can be no excuse for failing to carry out one's obligations, but even if they were, Appellee was not penalized for her first failure. Her ignorance was indulged, her mistake forgiven, and she was given a clear warning and reminded of the consequences of failing to comply with the terms of the Lease in the future. Only when she ignored that warning was she issued a notice to vacate for late payment of rent. 16PX1.

---

[13] Appellee stated, "And since we had a trial on July 2nd, there was no way I was going to pay her rent before the trial because in the event I got evicted, there would be no guarantee I would get my money back." 2R105.

[14] Appellee stated repeatedly at trial and argued through her counsel that rent was properly due on the third of the month, though the Lease states clearly that the due date is the first. 2R105, 2R176-2R177, 1PX1.

Under the Lease, Appellant was not obligated to accept late rent. 1PX1-1PX6, 2R41. That Appellant did accept late payment of rent in June does not alter the Lease Agreement or diminish Appellee's responsibility to pay rent on time in each subsequent month. *See Straus*, at 109. Though Appellee never made a clear waiver argument, it should be noted with clarity that acceptance of late rent does not constitute waiver of the right to receive rent on time. *See* Id. Appellee testified that she routinely paid rent to the prior owner on the third,[15] but any arrangement she may have made with him can have no bearing on the subsequent contract she executed with Appellant. Nor can it support an argument that Appellant waived her right or is estopped *by her own actions* from enforcing it. Under the current contract, rent was accepted late only once and a late notice was promptly issued reminding Appellee of her duty to pay on time in the future. But, again, waiver does not actually appear to be her argument.

More likely she intends to argue that because the Lease contemplates that rent may be paid late, late payment does not constitute default. Appellee can in fact find some support in the law for this position. *See Pecan*, (generally). In *Pecan*, the Court interpreted a lease with language that is very similar to the language of the Lease in this case, though not identical, and it ruled that because the lease contemplated that rent might be paid after the due date, such a late

---

[15] 2R105.

payment did not violate the lease. Id. However, *Pecan* is an unpublished memorandum opinion without the force of law and its underlying facts differ from the instant case in multiple, important ways.

First, though the landlord in that case presented evidence that the rent was not paid prior to the issuance of the notice to vacate, that evidence was disputed and the trial court issued findings of fact specifically noting its determination that the rent was tendered prior to the posting of the notice. Id. Second, the language of the lease in *Pecan* provided that if the tenant failed to "pay all rent on or before the 3rd day of the month *and we haven't given notice to vacate before that date*, you'll pay an initial late charge…"[16] and the Court of Appeals and trial court both relied specifically on the emphasized language (which is not present in the Lease in this case) when making the determination that the lease contemplated payment on or by the third of the month before a notice to vacate is posted. Finally, the court made no mention of any provision in the lease in *Pecan* that stated that failure to pay rent on or by the due date would constitute default on the lease. See Id.

By contrast, in the instant case, rent for the month of July has still not been paid and rent for the month of August was never even tendered; the notice to vacate for late payment of rent was issued promptly on July 2, 2014, before

---

[16] Id (emphasis added).

Appellee made any attempt to pay her July rent; and the Lease states with specificity that a failure to pay rent by the due date constitutes default.

A contract should not be interpreted in such a manner as to make one or more of its terms superfluous or meaningless and this Lease should not be construed in such a manner that this term is rendered meaningless. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). If payment that is late is not late because the Lease anticipates that payment may sometimes be accepted late, then the term that states clearly that late payment constitutes default is meaningless. Indeed, by that logic, the Lease could not be breached by late payment of rent even up to the eighteenth day of the month.[17] The implications of such a ruling would be severe. All landlords operating under this extremely common language could expect delays of sixty percent of the month, every month, on all of their leased units. This would, in turn, impact their ability to pay on time any mortgage payments due to their mortgage holders and it is certainly not what was intended by the use of these terms, given their plain meaning.

Only one interpretation of the Lease gives meaning to all of the terms cited above: that the Lease provides that Appellant is entitled to assess late fees if Appellee pays rent late after the third day of the month but doing so does not al-

---

[17] The Lease states that late charges may be assessed for payments made after "the 3rd day of the month" and that "[d]aily late charges will not exceed 15 days for any single month's rent." 1PX1.

ter the due date. That Appellant *may* accept late payment of rent does not mean that Appellant *must* accept late payment of rent. 1PX1, 2R37-2R38. Nor is Appellant required under the Lease to terminate Appellee's right of occupancy for any violation or default. The Lease makes clear what acts or omissions constitute default and gives Appellant the right to retake possession, but it does not presume to decide for Appellant whether or not a specific breach or default is worth suing over. It prohibits the late payment of rent and prescribes two remedies, eviction for default and assessment of late fees, which are most reasonably interpreted as mutually exclusive options from which the landlord may make the choice that is most appropriate in the individual case.[18]

The language could be clearer, but it is clear enough. It has a plain meaning. It means that:

1. rent is due by the first and must be paid on the first and
2. if it is not paid on the first then Appellant is in default and
3. Appellee may end her right of occupancy, but
4. if she declines to do so, a late fee may be assessed to any accepted payment of rent made after the third day of the month.

In conclusion: under the terms of the Lease, Appellee was required to pay rent for the month of June on or before June 1, 2014, and for the month of July on or before July 1, 2014. When Appellee failed to pay rent on time in June,

---

[18] Indeed, it is not entirely clear that the options are in fact mutually exclusive and that the landlord could not both accept late payment of rent *and* initiate eviction proceedings, but this question is, thankfully, not before the Court in this matter.

Appellant accepted it late but reiterated that future rent was due on the first of the month with no grace period. When Appellee again failed to pay rent on time in July, she was in default. When Appellee defaulted, Appellant was entitled to end her right of occupancy. Appellee admitted or failed to dispute the evidence of the facts making up the elements of this breach. Her only dispute was related solely to her misunderstanding of the Lease (the construction of which is a matter of law to be decided by the Court), and not to the actual facts making up the elements of the breach. Therefore, no genuine issue of fact existed for submission to the jury and Appellant was entitled to a judgment in her favor on the issue of late payment of rent as a matter of law.

## C. The Jury Verdict on the Issue of Late Payment of Rent was Unsupported by the Evidence.

Jury Question Number Two was submitted to the jury following the close of all evidence, asking, "Did [Appellee] fail to comply with the lease by failing to pay her rent in a timely manner? (A) Failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include: 1. The extent to which the injured party will be deprived of the benefit which she reasonably expected; 2. The extent to which the injured party can be adequately compensated for the part of that benefit of which she will be deprived; 3. The extent to which the party failing to perform or to offer to perform

will suffer forfeiture; 4. The likelihood that the party failing to perform or to offer to perform will cure her failure, taking into account the circumstances including any reasonable assurances; 5. The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." CR146.

The determination the jury was asked to make would have been more clearly understandable if made in response to the jury questions #2, #3 and #3A submitted by Appellant prior to trial.[19] Answers to these more specific questions of fact would have made plain the jury's interpretation of the evidence and would have provided a superior foundation for a judgment for or against Appellant on the question of law that was actually before the court of whether or not Appellee failed to make timely payment of rent.

Additionally, the question submitted by the court asked the jury to rule on the materiality of a breach of the Lease by failing to pay rent by the due date. CR146. A ruling on materiality was not necessary as the parties agreed that a breach by failing to pay rent on time would be material and grounds for eviction when they entered into a contract that stated expressly and with specificity that "[i]f [Appellee does] not pay rent on time, [she will] be in default and all reme-

---

[19] Specifically, Appellant proposed that the jury be asked if Appellee was "required to pay rent in the amount of $2,100.00 to [Appellant] on or before the first of the month, each month, with no grace period[,]" if Appellee did "make the payment scheduled for July 1, 2014, on or before July 1, 2014[,]" and if Appellee did "make the payment scheduled for August 1, 2014, on or before August 1, 2014[.]" CR141.

dies under state law and this Lease Contract will be authorized." 1PX1. The court's including instruction on the issue of materiality could only have served to confuse the jury and to reduce confidence in its answer.

Therefore, the court erred in rejecting Appellant's questions and substituting its own inferior question to the jury in the charge and Appellant is entitled to a new trial on the issue.

However, even if the question, as presented, was adequate to address the issue before the court, the jury gave an answer thereto that is wholly unsupported by the evidence submitted for its consideration. Appellant testified that Appellee was required to pay rent on or before the first of the month. The Lease clearly provides that rent is due by that day with no grace period. Appellee admitted that she did not pay rent for the month of July of 2014 and did not attempt to pay it until July 3, 2014. Her only dispute was related solely to her misunderstanding of the Lease, (the construction of which is a matter of law to be decided by the Court), and not to the actual facts making up the elements of the breach.

Therefore, the evidence of the facts making up the elements of this breach of the Lease Agreement was overwhelmingly in favor of Appellant and the jury rendered a verdict that was contrary to the great weight and preponderance of all relevant evidence on the issue whether or not Appellee defaulted on the Lease

Agreement by failing to pay rent on time for the month of July of 2014. Because the jury rendered a verdict on the issue of late payment of rent that is contrary to the great weight and preponderance of all relevant evidence and because the court issued a take nothing judgment based upon that verdict, the court erred, the error is reversible and Appellant is entitled to a new trial.

### III. THE TRIAL COURT ERRED WHEN IT REFUSED TO SUBMIT TO THE JURY APPELLANT'S QUESTIONS RELATING TO APPELLEE'S REFUSAL OF ACCESS OR TO ENTER JUDGMENT THAT APPELLEE BREACHED THE LEASE BY REFUSING ACCESS FOR MAINTENANCE AND REPAIR.

### A. Appellant Was Entitled to Judgment as a Matter of Law that Appellee Breached the Lease by Refusing Peaceful Entry to Perform Maintenance and Repair.

In Section 20, "Prohibited Conduct," the Lease provides that Appellee "may not engage in the following activities[,]" including, "disturbing or threatening the rights, comfort, … or convenience of others (including [Appellant and her] agents and employees)[.]" 1PX2. In Section 28, "When We May Enter," the Lease provides that Appellant and certain agents "may peacefully enter the dwelling at reasonable times" for certain purposes including, "making repairs or replacements; estimating repair or refurbishment costs; … [and] doing preventative maintenance[.]" 1PX4. In Section 32, "Default by Tenant," the Lease provides that Appellee will "be in default if: (1) [she does not] pay rent … on time; [or Appellee] or any guest or occupant violates this Lease Contract [or Appel-

37

lant's] rules[.]"  Id.  In that same section, the Lease provides that, if Appellee defaults, Appellant "may end [her] right of occupancy by giving [her] a 24-hour written notice to vacate."  Id.

Appellant testified and Appellee did not dispute that at the time of the purchase of the property and execution of the Lease, the property was in need of numerous repairs, many of which related to the safety and security of the occupants and the integrity of the structure itself.  2R42-2R43.  Appellant also testified that she requested entry only at reasonable times and for the legitimate purposes of planning for and making these necessary repairs, as she was expressly entitled to do under the terms of the Lease, and no evidence exists in the record of any attempt to enter at an unreasonable time or for any illegitimate purpose. See 2R47, 2R115-2R118.

Nevertheless, Appellee quickly took the position that Appellant's doing so was disagreeable and she began to resist.  2R128.  Though some dispute and perhaps confusion exists in the testimony regarding when exactly and how many times Appellant requested access to the house to perform maintenance and repairs, by Appellee's own admission, it was not more than four times during the period before she started resisting Appellant's requests.  2R115-2R118, 2R128. It was Appellee who first took on an adversarial tone when she transmitted to Appellant a letter that termed Appellant's requests "excessive," which letter also

contained a thinly veiled threat of legal action to prevent her from exercising rights expressly granted to her under the Lease. 9PX1. This began a campaign of what Appellee herself termed "passive-aggressive resistance" that would continue and become progressively more antagonistic for the remainder of her tenancy. 2R133.

Very shortly thereafter, Appellee took the extraordinary step of exposing herself in an indecent state to Appellant and her contractor when they attempted to enter the property to perform repairs. 2R62. Appellee admitted that her doing so was not mere flighty caprice, but rather a calculated tactic intended to resist passively and to frustrate Appellant's attempts at peaceful entry. 2R133.

Though Appellant had a right under the Lease to continue her efforts to repair the property and though no evidence was presented other than Appellee's own opinion that the frequency of the visits was unreasonable or unduly burdensome, Appellant dramatically reduced the frequency of her requests in accordance with Appellee's wishes. 2R63-2R65, 2R125. No requests were made in June and only two requests were made in July. Id. Nevertheless, in response to the second of these, Appellee transmitted to Appellant an email, wherein she expressly refused Appellant access to the residence and demanded that Appellant cease contacting her regarding future requests for access. 9PX1, 2R66; *see* 2R106.

Appellee, through her attorney in his closing statement at trial, appeared to intend to argue that no refusal took place.[20] On the contrary, the email transmission in question constitutes a clear refusal of access, not just for the day in question, but for the future as well. Appellee stated in her letter, "I will not accommodate your demand to enter the house tomorrow whatsoever," and demanded that Appellant cease contacting her. 9PX1, 2R66. Whatever may have been her intent in drafting the letter, the language she used has a clear, plain meaning of refusal.

However, even if Appellee's language does not constitute a definite refusal of access, the distinction is immaterial as her admitted resistance is sufficient to violate the Lease. The Lease grants Appellant the right of *peaceful* entry to perform maintenance and repairs. 1PX4. It serves no one's interests to require a landlord to force her way into a tenant's home even if she has the right under the Lease to do so. That Appellant accepted Appellee's refusal, canceled further plans for repairs and chose to pursue her rights in court was in the interests of Appellant's safety and the preservation of peace and order.

When interpreting a contract, the Court should give effect to all the terms thereof and should not interpret any term in such a manner as to make it superfluous or meaningless. *Coker*, at 393. The term "peaceful" must mean some-

---

[20] Appellee's attorney argued, "You've heard [Appellant's attorney] use the word resistance. Resist. Resisting. You never heard him use the word refuse." 2R176.

thing and in this context its plain meaning is to ensure that the landlord is able to exercise her right to enter to perform repairs without undue resistance from the tenant. This is not some throw-away term or afterthought to be ignored or interpreted into meaninglessness. To a landlord like Appellant, who owns few properties and manages them herself, this term is among the most important in the Lease. *See* 2R73. This is the term that protects her right to remove from the property a tenant who is actively trying to make her miserable. Id.

Appellee does not own the house. Her right to occupy it is contractual and contingent upon her upholding her end of the bargain by abiding by the rules of occupancy enumerated in the contract. Under the terms of that contract, she had a duty to provide Appellant *peaceful* entry to perform maintenance and to make repairs and she had no right to resist Appellant's efforts to do so, passively, aggressively or otherwise. She had no right under the Lease to determine what repairs and maintenance were necessary or desirable, or the pace at which repairs would be performed, or the frequency with which access would be required to perform them. She had no right to demand that Appellant cease contacting her to request access.

When she transmitted to Appellant by electronic mail a refusal to provide access to the residence to perform maintenance and a demand that Appellant cease making future requests for access to perform maintenance and repairs, she

was in default. When she resisted Appellant's requests for access to the residence and deliberately took action with the express intent of frustrating Appellant's attempts to perform repairs and maintenance and of making Appellant and her agent uncomfortable, she disturbed the comfort and convenience of Appellant and her agent and she was in default. When Appellee defaulted, Appellant was entitled to end her right of occupancy. Appellee admitted or failed to dispute the evidence of the facts making up the elements of this breach. Therefore, no genuine issue of fact existed for submission to the jury and Appellant was entitled to a judgment in her favor on the issue of refusal to provide peaceful entry for maintenance and repair as a matter of law.

### B. The Jury Verdict on the Issue of Refusal of Peaceful Entry to Perform Maintenance and Repair was Unsupported by the Evidence.

Jury Question Number One was submitted to the jury following the close of all evidence, asking, "Did [Appellee] unreasonably refuse to allow [Appellant] or her repairers, servicers, contractors, or representatives to enter the house peacefully for the purpose of making repairs, estimating repair or refurbishing costs, or doing preventative maintenance?" CR145.

The determination the jury was asked to make would have been more clearly understandable if made in response to the jury questions #4, #4A and #5

submitted by Appellant prior to trial.[21]  Answers to these more specific questions of fact would have made plain the jury's interpretation of the evidence and would have provided a superior foundation for a judgment for or against Appellant on the question of law that was actually before the court of whether or not Appellee violated the Lease.

Therefore, the court erred in rejecting these questions and substituting its own inferior question to the jury in the charge and Appellant is entitled to a new trial on the issue.

However, even if the question, as presented, was adequate to address the issue before the court, the jury gave an answer thereto that is wholly unsupported by the evidence submitted for its consideration.  Appellant testified that Appellee obstinately resisted her efforts to repair the property by methods steadily increasing in strength and frequency over the course of the tenancy.  Appellee admitted that this was a calculated campaign of "passive-aggressive resistance".  And Appellant testified and Appellee admitted that Appellee sent to Appellant an express refusal of present and future access to the residence for Appellant's maintenance and repair purposes.

---

[21] Specifically, Appellant proposed that the jury be asked if she was "entitled to enter the residence at reasonable times for purposes including the making of repairs and the performance of maintenance[,]" if Appellee was "required to provide [her] access to the residence for those purposes[,]" and if she sent Appellant "an email stating her refusal to allow Plaintiff to enter the residence to make repairs and perform maintenance[.]"  CR141.

Because the evidence of the facts making up the elements of this breach of the Lease Agreement was overwhelmingly in favor of Appellant the jury rendered a verdict that was contrary to the great weight and preponderance of all relevant evidence on the issue of whether or not Appellant defaulted on the Lease Agreement by failing to provide peaceful entry to the residence for maintenance and repair. Because the jury rendered a verdict on the issue of refusal to provide peaceful entry for maintenance and repair that is contrary to the great weight and preponderance of all relevant evidence and because the court issued a take nothing judgment based upon that verdict, the court erred, the error is reversible and Appellant is entitled to a new trial.

## IV. THE TRIAL COURT ERRED WHEN THE PRESIDING JUDGE DEMONSTRATED BIAS AGAINST AND HOSTILITY AND ANIMOSITY TOWARD APPELLANT AND HER CLAIMS AT TRIAL.

All of the jury's answers to the questions submitted to it for consideration were wholly unsupported by the evidence presented at trial. *See supra*, §§ I(D), II(C), III(B). These answers are, perhaps, easier to understand in light of the conduct, comments and apparent opinions of the presiding judge.

When a presiding judge at trial demonstrates bias and prejudice against one party or in favor of the other, or animosity toward the party's counsel, the party is entitled to a new trial. *Shaw v. Greater Houston Transp. Co.*, 791

S.W.2d 204, 211 (Tex.App.Corpus.Christi,1990, no pet.). This remains true even if many of the incidents complained of occurred outside the presence of the jury. Id. While the presiding judge in the instant case had little patience for the litigants and attorneys on both sides, throughout the trial he made his hostility for Appellant, her claims and her position abundantly clear, in the presence of the jury.

1. The presiding judge interfered with the presentation of evidence by refusing to allow witnesses to read from admitted documents in order to highlight the relevant portions thereof for the jury's benefit. 2R36, 2R38.
2. The presiding judge interrupted testimony to give his own personal recollections and understandings about matters similar to those being testified to, and directly challenged Appellant's credibility. 2R66.
3. The presiding judge commented on the evidence and derided Appellant's decision to cancel scheduled repairs after being refused access to the property, stating, "It appears you're looking for trouble where there isn't any." 2R68.
4. The presiding judge interpreted an answer given by Appellant during cross-examination using phrasing that could only have been intended to cast doubt upon her memory, when in fact it was not appellant's memory that was faulty, but Appellee's attorney's.[22]
5. The presiding judge actively assisted Appellee's attorney in cross-examining Appellant by asking a hostile follow-up question after Appellant gave a specific answer to Appellee's attorney's question.[23]

---

[22] Appellee, through her counsel, stated that Appellant had testified that difficulties with Appellee had begun "almost immediately." Nowhere in the record did Appellant make such a statement. In fact, her attorney made a similar statement in opening argument, but Appellant never gave that testimony. 2R20. The tenor of the presiding judge's question, "You don't remember?" and correction of her testimony, "Okay. That's the answer. No." could have no purpose other than to undermine Appellant's credibility. 2R79-2R80.

[23] Appellant was asked when problems began with Appellee and she responded that on a particular date was "the first time she asked me to come at a different time." The presiding judge asked, pointedly, if asking her to come at a different time was a "problem," effectively feeding that question to Appellee's attorney, who then reiterated it. The follow-up question could have no purpose other than to make Appellant's answer to the original question appear to be unreasonable and, as such, is perfectly fair game during cross-examination by an adversarial

45

6. The presiding judge interrupted testimony, again to assist Appellee's counsel in cross-examining Appellant, asked Appellant hostile, misleading questions and supplanted her precise and accurate responses with inaccurate responses that misinterpreted the evidence in the record.[24]

7. The presiding judge interrupted testimony to comment on the weight of evidence during cross-examination of Appellee and to call Appellant's counsel's line of questioning "a waste of time." 2R134.

8. After Appellee failed twice to give an answer that was responsive to Appellant's attorney's question and, on the third attempt, opined that "I think we're beating a dead horse but yes[,]" the presiding judge interjected, "Boy, do I too. But I don't have an objection so I have to let it go on. I just get so sick." 2R154.

These indications that the presiding judge had unequivocally chosen a side are not subtle, but rather they are direct reflections, visible to the jury, of the presiding judge's opinions of the weight of the evidence adduced and the claims Appellant has made against Appellee. Further, it is not necessary to guess at those opinions. Out of the presence of the jury, the presiding judge stated them clearly.

1. After Appellee, through her counsel, closed her case in chief without offering any evidence, the presiding judge questioned the decision to leave the evidence as it then stood in a tone that caused her immediately to change her mind and give testimony. 2R94-2R95.

___

opposing party. Such a question from the bench illustrates to the jury that the judge has become an advocate, hostile to the witness. 2R80.

[24] Appellant was asked by opposing counsel when she made her deposit account unavailable to Appellee for payment of rent and she responded with a certain date. The presiding judge then asked her, with a leading question, if it was not, therefore, impossible for Appellee to pay her. Appellant responded, accurately, that Appellee was prevented from making payment by the method specified in the contract, but that payment was not 'impossible' and the judge stated, "The only way you've given her to pay rent is by depositing it directly into your bank account[,]" which statement can only have been intended to convey that the court had concluded that Appellee could not have paid by other means, such as by paying disputed sums into the registry of the court, though other such means were in fact available to her. 2R88-2R89.

2. The presiding judge stated that no evidence had been given "that rent wasn't paid on time[,]" though this was unequivocally untrue as Appellant had testified at length about that very issue. 2R96.
3. The presiding judge then stated clearly his position on the merits of Appellant's case, stating, "I've never seen a landlord who refused to receive rent on the 2nd or the 3rd just like the contract says." Id.
4. In conceding, grudgingly, that the issue should be submitted to the jury for consideration, the presiding judge stated sarcastically, regarding Appellant's position, "That's as lovely as everything else about this case." 2R97.
5. At the hearing on post-judgment motions, the presiding judge said, regarding Appellant's legal position relating to late payment of rent, "Your position is ridiculous." SR6.

When a jury has been impaneled as the finder of fact, but the presiding judge has clearly chosen a side, even if in error, the jury is invited to substitute the judge's decision for its own and to render the judge's own subjective opinion as its verdict. Because the presiding judge abandoned impartiality and clearly telegraphed to the jury his opinion of the evidence and the merits of Appellant's claims, the well was poisoned and Appellant is entitled to a new trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellant respectfully requests that the Court reverse the judgment of the trial court and render judgment in Appellant's favor for Appellee's unpaid rent for the months of July and August of 2014, Appellant's reasonable pre-trial attorney fees, costs of court and pre- and post-judgment interest, and that the Court remand this matter to the trial court for a new trial on the issue of trial and post-judgment attorney fees; or, in the alternative, reverse the trial court's judgment and remand this matter to the trial court for a new trial on all issues; or, in the alternative, vacate the trial court's judgment on all issues.

Respectfully submitted,

DAVID NOWLIN


 /s/  David Nowlin_____
State Bar No. 24049196

7301 RR 620 North, Ste. 155, 319
Austin, Texas 78726-4537
Telephone:   (512) 468-4882
Email:        DavidNowlin@me.com

ATTORNEY FOR APPELLANT

## CERTIFICATE OF COMPLIANCE

I certify that this brief was prepared using Microsoft Word and that, according to that program's word counting function, the document (excluding the caption, identification of the parties and counsel, table of contents, index of authorities, statement of the case, points of error, certificate of compliance, certificate of service and appendix) contains 10,912 words. The body text is in 14 point, Times New Roman font and the footnotes are in 12 point, Times New Roman font.

/s/ David Nowlin_____
State Bar No. 24049196


## CERTIFICATE OF SERVICE

I certify that on December 26, 2014, a true and correct copy of Appellant's Brief was served by mail on Robby Abarca, the attorney of record for Appellee Lori Keaton, at P.O. Box 152547, Austin, TX 78715.

/s/ David Nowlin_____
State Bar No. 24049196

# APPENDIX

The following pages constitute the Appendix to Appellant's Brief, and contain:

(A)  The Final Judgment of the Trial Court,

(B)  The Jury Charge and Verdict, and

(C)  The Text of the Rules and Statutory Authority and the Lease Upon Which Appellant's Argument is Based, including:

    (1)  Texas Property Code § 24.002,

    (2)  Texas Property Code § 24.0051,

    (3)  Texas Property Code § 24.006,

    (4)  Texas Property Code § 24.008,

    (5)  Texas Rule of Appellate Procedure 43.2,

    (6)  Texas Rule of Appellate Procedure 43.3,

    (7)  Texas Rule of Civil Procedure 273,

    (8)  Texas Rule of Civil Procedure 276,

    (9)  Texas Rule of Civil Procedure 301,

    (10)  Texas Rule of Civil Procedure 510.11, and

    (11)  The Lease.

## No. C-1-CV-14-006938

| | | |
|---|---|---|
| Linda Nowlin, | § | IN THE COUNTY COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| Lori Keaton, | § | |
| Defendant | § | COUNTY COURT NO. 2 |

### FINAL JUDGMENT

On August 25, 2014, this case was called for trial. Plaintiff, Linda Nowlin, represented by counsel announced ready for trial. Defendant, Lori Keaton, represented by counsel announced ready for trial. After a jury was impaneled and sworn, it heard evidence and arguments of counsel. In response to the jury charge, the jury made findings that the Court received, filed, and entered of record. ~~The questions submitted to the jury and the jury's findings are attached as Exhibit A and incorporated by reference.~~

All matters in controversy, legal and factual, were submitted to the Court for its determination. The Court heard the evidence and arguments of counsel and announced its decision for Defendant.

~~The Court orally RENDERED judgment for DEFENDANT on August 25, 2014~~. This written judgment memorializes that rendition.

1. Accordingly, the Court orders that plaintiff take nothing and that defendant recover court costs from plaintiff.
2. This judgment finally disposes of all claims and all parties, and is ~~not~~ appealable. ~~because this Court lost subject matter jurisdiction of this controversy on September 5, 2014 when Defendant relinquished possession of the premises at 3907 Eck Lane for cause, as Defendant successfully defended herself against the wrongful eviction suit brought by plaintiff in Justice Court, Travis County, Texas, Precinct 2 and again won on appeal in Travis County, Court at Law 1.~~

SIGNED on _Sept 17_, 20_14_.

_____
PRESIDING JUDGE

000904003

176

CAUSE NO. C-1-CV-14-006938

| LINDA NOWLIN | § | IN THE COUNTY COURT |
|---|---|---|
| | § | |
| | § | AT LAW NUMBER 1 |
| v. | § | |
| | § | |
| LORI KEATON | § | TRAVIS COUNTY, TEXAS |

## <u>CHARGE OF THE COURT</u>

MEMBERS OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes. You must leave your notes with the bailiff when you are not deliberating. The bailiff will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions:

1. Do not let bias, prejudice, or sympathy play any part in your decision.
2. Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.
3. You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.
4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.
5. All the questions and answers are important. No one should say that any question or answer is not important.

1



000897604

*144*

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence. The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11. The answers to the questions must be based on the decision of at least 5 of the 6 jurors. The same 5 jurors must agree on every answer. Do not agree to be bound by a vote of anything less than 5 jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

A fact may be established by **"DIRECT EVIDENCE"** or by **"CIRCUMSTANTIAL EVIDENCE"** or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

## Question 1:

Did Lori Keaton unreasonably refuse to allow Linda Nowlin or her repairers, servicers, contractors, or representatives to enter the house peacefully for the purpose of making repairs, estimating repair or refurbishing costs, or doing preventive maintenance?

Answer "Yes" or "No".

Answer: ___No.___

2

145

## Question 2:

Did Lori Keaton fail to comply with the lease by failing to pay her rent in a timely manner?

A failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include:

1. The extent to which the injured party will be deprived of the benefit which she reasonably expected;
2. The extent to which the injured party can be adequately compensated for the part of that benefit of which she will be deprived;
3. The extent to which the party failing to perform or to offer to perform will suffer forfeiture;
4. The likelihood that the party failing to perform or to offer to perform will cure her failure, taking into account the circumstances including any reasonable assurances;
5. The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Answer: __No.__


## QUESTION 3:

What is a reasonable fee for the necessary services of Linda Nowlin's attorney for preparation and trial in this case, stated in dollars and cents?

Answer: __$2300.00__


Presiding Juror:

1. When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.
2. The presiding juror has these duties:
   a. have the complete charge read aloud if it will be helpful to your deliberations;
   b. preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;
   c. give written questions or comments to the bailiff who will give them to the judge;
   d. write down the answers you agree on;
   e. get the signatures for the verdict certificate; and
   f. notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

Instructions for Signing the Verdict Certificate:

3

146

1. You may answer the questions on a vote of 5 jurors. The same 5 jurors must agree on every answer in the charge. This means you may not have one group of 5 jurors agree on one answer and a different group of 5 jurors agree on another answer.

2. If 5 jurors agree on every answer, those 5 jurors sign the verdict.

If all 6 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3. All jurors should deliberate on every question. You may end up with all 6 of you agreeing on some answers, while only 5 of you agree on other answers. But when you sign the verdict, only those 5 who agree on every answer will sign the verdict.

Do you understand these instructions? If you do not, please tell me now.


_____
Judge Presiding

4

147

## CAUSE NO. C-1-CV-14-006938

| | | |
|---|---|---|
| LINDA NOWLIN | § | IN THE COUNTY COURT |
| | § | |
| v. | § | AT LAW NUMBER 1 |
| | § | |
| LORI KEATON | § | TRAVIS COUNTY, TEXAS |

### Verdict Certificate

Check one:

_√_ Our verdict is unanimous. All 6 of us have agreed to each and every answer. The presiding juror has signed the certificate for all 6 of us.


_____              JEFFREY PAUTLER
Signature of Presiding Juror           Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Five of us have agreed to each and every answer and have signed the certificate below.

SIGNATURE                              NAME PRINTED

1. _____           _____

2. _____           _____

3. _____           _____

4. _____           _____

5. _____           _____

5

148

# Texas Property Code § 24.002

FORCIBLE DETAINER.

(a)    A person who refuses to surrender possession of real property on demand commits a forcible detainer if the person:

    (1)    is a tenant or a subtenant wilfully and without force holding over after the termination of the tenant's right of possession;

    (2)    is a tenant at will or by sufferance, including an occupant at the time of foreclosure of a lien superior to the tenant's lease;  or

    (3)    is a tenant of a person who acquired possession by forcible entry.

(b)    The demand for possession must be made in writing by a person entitled to possession of the property and must comply with the requirements for notice to vacate under Section 24.005.

# Texas Property Code § 24.0051

PROCEDURES APPLICABLE IN SUIT TO EVICT AND RECOVER UN-PAID RENT.

(a)    In a suit filed in justice court in which the landlord files a sworn statement seeking judgment against a tenant for possession of the premises and unpaid rent, personal service on the tenant or service on the tenant under Rule 742a, Texas Rules of Civil Procedure, is procedurally sufficient to support a default judgment for possession of the premises and unpaid rent.

(b)    A landlord may recover unpaid rent under this section regardless of whether the tenant vacated the premises after the date the landlord filed the sworn statement and before the date the court renders judgment.

(c)    In a suit to recover possession of the premises, whether or not unpaid rent is claimed, the citation required by Rule 739, Texas Rules of Civil Procedure, must include the following notice to the defendant:

FAILURE TO APPEAR FOR TRIAL MAY RESULT IN A DEFAULT JUDGMENT BEING ENTERED AGAINST YOU.

(d)     In a suit described by Subsection (c), the citation required by Rule 739, Texas Rules of Civil Procedure, must include the following notice to the defendant on the first page of the citation in English and Spanish and in conspicuous bold print:

SUIT TO EVICT

THIS SUIT TO EVICT INVOLVES IMMEDIATE DEADLINES.  A TENANT WHO IS SERVING ON ACTIVE MILITARY DUTY MAY HAVE SPECIAL RIGHTS OR RELIEF RELATED TO THIS SUIT UNDER FEDERAL LAW, INCLUDING THE SERVICEMEMBERS CIVIL RELIEF ACT (50 U.S.C. APP. SECTION 501 ET SEQ.), OR STATE LAW, INCLUDING SECTION 92.017, TEXAS PROPERTY CODE.  CALL THE STATE BAR OF TEXAS TOLL-FREE AT 1-877-9TEXBAR IF YOU NEED HELP LOCATING AN ATTORNEY.  IF YOU CANNOT AFFORD TO HIRE AN ATTORNEY, YOU MAY BE ELIGIBLE FOR FREE OR LOW-COST LEGAL ASSISTANCE.

**Texas Property Code § 24.006**

ATTORNEY'S FEES AND COSTS OF SUIT.

(a)     Except as provided by Subsection (b), to be eligible to recover attorney's fees in an eviction suit, a landlord must give a tenant who is unlawfully retaining possession of the landlord's premises a written demand to vacate the premises.  The demand must state that if the tenant does not vacate the premises before the 11th day after the date of receipt of the notice and if the landlord files suit, the landlord may recover attorney's fees.  The demand must be sent by registered mail or by certified mail, return receipt requested, at least 10 days before the date the suit is filed.

(b) If the landlord provides the tenant notice under Subsection (a) or if a written lease entitles the landlord to recover attorney's fees, a prevailing landlord is entitled to recover reasonable attorney's fees from the tenant.

(c) If the landlord provides the tenant notice under Subsection (a) or if a written lease entitles the landlord or the tenant to recover attorney's fees, the prevailing tenant is entitled to recover reasonable attorney's fees from the landlord. A prevailing tenant is not required to give notice in order to recover attorney's fees under this subsection.

(d) The prevailing party is entitled to recover all costs of court.

## Texas Property Code § 24.006

EFFECT ON OTHER ACTIONS.

An eviction suit does not bar a suit for trespass, damages, waste, rent, or mesne profits.

## Texas Rule of Appellate Procedure 43.2

**Types of Judgment**

The court of appeals may:

(a) affirm the trial court's judgment in whole or in part;

(b) modify the trial court's judgment and affirm it as modified;

(c) reverse the trial court's judgment in whole or in part and render the judgment that the trial court should have rendered;

(d) reverse the trial court's judgment and remand the case for further proceedings;

(e) vacate the trial court's judgment and dismiss the case; or

(f) dismiss the appeal.

# Texas Rule of Appellate Procedure 43.3

## Rendition Appropriate Unless Remand Necessary

When reversing a trial court's judgment, the court must render the judgment that the trial court should have rendered, except when:

(a)    a remand is necessary for further proceedings; or

(b)    the interests of justice require a remand for another trial.

# Texas Rule of Civil Procedure 273

## Jury Submissions

Either party may present to the court and request written questions, definitions, and instructions to be given to the jury; and the court may give them or a part thereof, or may refuse to give them, as may be proper. Such requests shall be prepared and presented to the court and submitted to opposing counsel for examination and objection within a reasonable time after the charge is given to the parties or their attorneys for examination. A request by either party for any questions, definitions, or instructions shall be made separate and apart from such party's objections to the court's charge.

# Texas Rule of Civil Procedure 276

## Refusal or Modification

When an instruction, question, or definition is requested and the provisions of the law have been complied with and the trial judge refuses the same, the judge shall endorse thereon "Refused," and sign the same officially. If the trial judge modifies the same the judge shall endorse thereon "Modified as follows: (stating in what particular the judge has modified the same) and given, and exception allowed" and sign the same officially. Such refused or modified instruction, question, or definition, when so endorsed shall constitute a bill of exceptions, and it shall be conclusively presumed that the party asking the same presented it at the proper time, excepted to its refusal or modification, and that all the requirements of law have been observed, and such procedure shall entitle the party requesting

the same to have the action of the trial judge thereon reviewed without preparing a formal bill of exceptions.

## Texas Rule of Civil Procedure 301

### Judgments

The judgment of the court shall conform to the pleadings, the nature of the case proved and the verdict, if any, and shall be so framed as to give the party all the relief to which he may be entitled either in law or equity. Provided, that upon motion and reasonable notice the court may render judgment non obstante veredicto if a directed verdict would have been proper, and provided further that the court may, upon like motion and notice, disregard any jury finding on a question that has no support in the evidence. Only one final judgment shall be rendered in any cause except where it is otherwise specially provided by law. Judgment may, in a proper case, be given for or against one or more of several plaintiffs, and for or against one or more of several defendants or intervenors.

## Texas Rule of Civil Procedure 510

### Damages on Appeal

An eviction case appealed to county court will be subject to trial at any time after the expiration of 8 days after the date the transcript is filed in the county court. If the defendant has filed a written answer in the justice court, it must be taken to constitute his appearance and answer in the county court and may be amended as in other cases. If the defendant made no answer in writing in the justice court and fails to file a written answer within 8 days after the transcript is filed in the county court, the allegations of the complaint may be taken as admitted and judgment by default may be entered accordingly.

TEXAS APARTMENT ASSOCIATION
M E M B E R

Residential Lease Contract

*This Lease Contract is only valid if filled out before Janua. 014.*

*This is a binding contract. Read carefully before signing.*

Today's Date of Lease Contract: **4/12/14**
(when this Lease Contract is filled out)

## Moving In — General Information

**1. PARTIES.** This Lease Contract is between *you*, the resident(s) *(list all people signing the Lease Contract):*

**Lori Keaton**

and *us*, the owner:

**Linda Nowlin**

You've agreed to rent the following dwelling *[check one]:* ☑ house, ☐ duplex unit, or ☐ other unit, and any grounds, garage or other improvements located at **3907 Eck Ln**
*(street address)*
in **Austin** *(city)*,
Texas, **78734** *(zip code)* for use as a private residence only. The terms "you" and "your" refer to all residents listed above, and a person authorized to act in the event of a sole resident's death. The terms "we," "us," and "our" refer to the owner listed above and not to property managers or anyone else. Written notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty for each guarantor must be executed.

**2. OCCUPANTS.** The dwelling will be occupied only by you and *(list all other occupants not signing the Lease Contract):*

**Levi + DJ Keaton**
**Robby Abarca**
**Cristian Abarca**

No one else may occupy the dwelling. Persons not listed above must not stay in the dwelling for more than **5** consecutive days without our prior written consent, and no more than twice that many days in any one month. *If the previous space isn't filled in, two days per month is the limit.*

**3. LEASE CONTRACT TERM.** The initial term of the Lease Contract begins on the **1** day of **May**, **2014** *(year)*, and ends at midnight the **30** day of **April 2015** *(year)*. This Lease Contract will automatically renew month-to-month unless either party gives at least **30** days written notice of termination or intent to move out as required by paragraph 37. *If the number of days isn't filled in, at least 30 days notice is required.*

**4. SECURITY DEPOSIT.** The total security deposit for all residents is $ **N/A**, due on or before the date this Lease Contract is signed. This amount *[check one]:* ☐ does or ☑ does not include an animal deposit. Any animal deposit will be stated in an animal addendum. See paragraphs 41 and 42 for security deposit return information.
**$2000 Sec. dep. to be xferd at closing**

**5. KEYS, FURNITURE AND AFFIDAVIT OF MOVE-OUT.** You will be provided **1** dwelling key(s), _____ mailbox key(s), and _____ other access devices for _____. Any resident, occupant, or spouse who, according to a remaining resident's affidavit, has permanently moved out or is under court order not to enter the dwelling, is (at our option) no longer entitled to occupancy, keys, or other access devices. Your dwelling will be *[check one]:* ☐ furnished or ☐ unfurnished.

**6. RENT AND CHARGES.** You will pay $ **2100** per month for rent, in advance and without demand at **owner's acct at Wells Fargo Bank** and payable to ☑ owner or ☐ _____.
Prorated rent of $ **N/A** is due for the remainder of *[check one]:* ☐ 1st month or ☐ 2nd month, on _____ *(year)*. Otherwise, you must pay your rent on or before the 1st day of each month (due date) with no grace period. Cash is unacceptable without our prior written permission. You must not withhold or offset rent unless authorized by statute. We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. If you don't pay all rent on or before the **3rd** day of the month, you'll pay an initial late charge of $ **50** plus a daily late charge of $ **25** per day after that date until paid in full. Daily late charge will not exceed 15 days for any single month's rent. We will not impose late charges until at least the third day of the month. You'll also pay a charge of $ **50** for each returned check or rejected electronic payment, plus initial and daily late charges until we receive acceptable payment. Daily late charges will not exceed 15 days for any single month's rent. If you don't pay rent on time, you'll be in default and all remedies under state law and this Lease Contract will be authorized. If you violate the animal restrictions of paragraph 27 or other animal rules, you'll pay an initial charge of $ **100** per animal (not to exceed $100 per animal) and a daily charge of $ **10** per animal (not to exceed $10 per day per animal) from the date the animal was brought into your dwelling until it is finally removed. We'll also have all other remedies for such violation.

**7. UTILITIES/SERVICES.** You'll pay for all utilities and services including electricity, gas, water, wastewater, trash/recycling, cable/satellite, and stormwater/drainage unless indicated in paragraph 10. You'll pay for all related deposits, charges or fees on such utilities and services. You must not allow any utilities (other than cable or Internet) to be cut off or switched for any reason—including disconnection for not paying your bills—until the Lease Contract term or renewal period ends. You must connect utilities in your name, and you must notify the utility provider of your move-out date so the meter can be timely read. If you delay getting it turned on in your name by lease commencement or cause it to be transferred back into our name before you surrender or abandon the dwelling, you'll be liable for a $ **N/A** charge (not to exceed $50 per violation), plus the actual or estimated cost of the utilities used while the utility should have been connected in your name. If you are in an area open to competition, you may choose or change your retail electric provider at any time. If you qualify, your provider will be the same as ours, unless you choose a different provider. If you choose or change your provider, you must give us written notice. You must pay all applicable provider fees, including any fees to change service back into our name after you move out.

**8. INSURANCE.** *Our insurance does not cover the loss of or damage to your personal property.* You are *[check one]:*
☐ required to buy and maintain renter's or liability insurance *(see attached addendum)*, or
☑ not required to buy renter's or liability insurance.
*If neither is checked, insurance is not required but is still strongly recommended. If not required, we urge you to get your own insurance for losses due to theft, fire, water damage, pipe leaks and other similar occurrences. Renter's insurance does not cover losses due to a flood. Information on renter's insurance is available from the Texas Department of Insurance.*

**9. SECURITY DEVICES. What We Must Provide.** Texas law requires, with some exceptions, that we must provide at no cost to you when occupancy begins: (1) a window latch on each window; (2) a doorviewer (peephole) on each exterior door; (3) a pin lock on each sliding door; (4) either a door handle latch or a security bar on each sliding door; (5) a keyless bolting device (deadbolt) on each exterior door; and (6) either a keyed doorknob lock or a keyed deadbolt lock on one entry door. Keyed lock(s) will be rekeyed after the prior resident moves out. The rekeying will be done either before you move in or within 7 days after you move in, as required by statute. If we fail to install or rekey security devices as required by the Property Code, you have the right to do so and deduct the reasonable cost from your next rent payment under Section 92.165(1), Texas Property Code.

**What You Are Now Requesting.** Subject to some limitations, under Texas law you may at any time ask us to: (1) install one keyed deadbolt lock on an exterior door if it does not have one; (2) install a security bar on a sliding glass door if it does not have those requests, but you must pay for them. Subject to statutory restrictions on what security devices you may request, you are now requesting us to install or change at your expense: _____

_____ *If no item is filled in, then you are requesting none at this time.*

**Payment.** We will pay for missing security devices that are required by statute. You will pay for: (1) rekeying that you request (except when we failed to rekey after the previous resident moved out); and (2) repairs or replacements due to misuse or damage by you or your family, occupants, or guests. You must pay immediately after the work is done unless state statute authorizes advance payment. You also must pay for additional or changed security devices you request, in advance or afterward, at our option.

## Special Provisions and "What If" Clauses

**10. SPECIAL PROVISIONS.** The following or attached special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease Contract and will supersede any conflicting provisions of this printed Lease Contract form.

**Owner provides 2 refrigerators (in kitchen + garage) washer, dryer and pool table. Of these, owner will only guarantee one refrigerator in kitchen.**

**11. UNLAWFUL EARLY MOVE-OUT; RELETTING CHARGE.** You'll be liable to us for a reletting charge of $ **1785** (not to exceed 85% of the highest monthly rent during the Lease Contract term) if you:
(1) fail to move in, or fail to give written move-out notice as required in paragraphs 23 or 37; or
(2) move out without paying rent in full for the entire Lease Contract term or renewal period; or
(3) move out at our demand because of your default; or
(4) are judicially evicted.
*The reletting charge is not a cancellation fee and does not release you from your obligations under this Lease Contract. See the first paragraph of page 2.*

YOUR INITIALS: _____ INITIALS OF OUR REPRESENTATIVE: _____

35

**Not a Release.** The reletting charge is not a Lease Contract cancellation or buyout fee. It is a liquidated amount covering only part of our damages; that is, our time, effort, and expense in finding and processing a replacement. These damages are uncertain and difficult to ascertain—particularly those relating to make ready, inconvenience, paperwork, advertising, showing the dwelling, utilities for showing, checking prospects, overhead, marketing costs, and locator-service fees. You agree that the reletting charge is a reasonable estimate of such damages and that the charge is due whether or not our reletting attempts succeed. If no amount is stipulated, you must pay our actual reletting costs so far as they can be determined. The reletting charge does not release you from continued liability for: future or past-due rent; charges for cleaning, repairing, repainting; or unreturned keys; or other sums due.

12. **DAMAGES AND REIMBURSEMENT.** You must promptly pay or reimburse us for loss, damage, consequential damages, government fines or charges, or cost of repairs or service in the dwelling due to a violation of the Lease Contract or rules, improper use, negligence, other conduct by you or your invitees, guests or occupants, or any other cause not due to our negligence or fault. You will indemnify and hold us harmless from all liability arising from the conduct of you, your invitees, guests, or occupants, or our representatives who perform at your request services not contemplated in this Lease Contract. **Unless the damage or wastewater stoppage is due to our negligence, we're not liable for — and you must pay for — repairs, replacements and damage to the following if occurring during the Lease Contract term or renewal period: (1) damage to doors, windows, or screens; (2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your dwelling.** We may require payment at any time, including advance payment of repairs for which you're liable. Delay in demanding sums you owe is not a waiver.

13. **CONTRACTUAL LIEN AND PROPERTY LEFT IN DWELLING.** **All property in the dwelling is (unless exempt under Section 54.042 of the Texas Property Code) subject to a contractual lien to secure payment of delinquent rent (except as prohibited by Section 2306.6736, Texas Government Code, for owners supported by tax credit allocations).** For this purpose, "dwelling" excludes outside areas but includes interior living areas and exterior patios, balconies, attached garages, and storerooms for your exclusive use.

**Removal After We Exercise Lien for Rent. If your rent is delinquent, our representative may peacefully enter the dwelling and remove and/or store all property subject to lien.** Written notice of entry must be left afterwards in the dwelling in a conspicuous place—plus a list of items removed. The notice must state the amount of delinquent rent and the name, address, and phone number of the person to contact about the amount owed. The notice must also state that the property will be promptly returned when the delinquent rent is fully paid. All property in the dwelling is presumed to be yours unless proven otherwise.

**Removal After Surrender, Abandonment, or Eviction.** We or law officers may remove or store all property remaining in the dwelling or in outside areas (including any vehicles you or any occupant or guest owns or uses) if you are judicially evicted or if you surrender or abandon the dwelling (see definitions in paragraph 42).

**Storage.** We will store property removed under a contractual lien. We may, but have no duty to, store property removed after judicial eviction, surrender, or abandonment of the dwelling. We're not liable for casualty loss, damage, or theft except for property removed under a contractual lien. You must pay reasonable charges for our packing, removing, storing, and selling any property. We have a lien on all property removed and stored after surrender, abandonment, or judicial eviction for all sums you owe, with one exception: Our lien on property listed under Property Code Section 54.042 is limited to charges for packing, removing, and storing.

**Redemption.** If we've seized and stored property under a contractual lien for rent as authorized by the Property Code, you may redeem the property by paying all delinquent rent due at the time of seizure. But if notice of sale (set forth as follows) is given before you seek redemption, you may redeem only by paying the delinquent rent and reasonable charges for packing, removing, and storing. If we've removed and stored property after surrender, abandonment, or judicial eviction, you may redeem only by paying all sums you owe, including rent, late charges, reletting charges, storage, damages, etc.

We may return redeemed property at the place of storage, the management office, or the dwelling (at our option). We may require payment by cash, money order, or certified check.

**Disposition or Sale.** Except for animals and property removed after the death of a sole resident, we may throw away or give to a charitable organization all items of personal property that are: (1) left in the dwelling after surrender or abandonment; or (2) left outside more than 1 hour after a writ of possession is executed, following a judicial eviction. Animals removed after surrender, abandonment, or eviction may be kenneled or turned over to local authorities or humane societies. Property not thrown away or given to charity may be disposed of only by sale, which must be held no sooner than 30 days after written notice of date, time, and place of sale is sent by both regular mail and certified mail (return receipt requested) to your last known address. The notice must itemize the amounts you owe and the name, address, and phone number of the person to contact about the sale, the amount owed, and your right to redeem the property. Sale may be public or private, is subject to any third-party ownership or lien claims, must be to the highest cash bidder, and may be in bulk, in batches, or item-by-item. Proceeds exceeding sums owed must be mailed to you at your last known address within 30 days after sale.

14. **FAILING TO PAY FIRST MONTH'S RENT.** If you don't pay the first month's rent when or before the Lease Contract begins, all future rent will be automatically accelerated without notice and immediately due. We also may end your right of occupancy and recover damages, future rent, reletting charges, attorney's fees, court costs, and other lawful charges. Our rights, remedies, and duties under paragraphs 11 and 32 apply to acceleration under this paragraph.

15. **RENT INCREASES AND LEASE CONTRACT CHANGES.** No rent increases or Lease Contract changes are allowed before the initial Lease Contract term ends, except for changes allowed by any special provisions in paragraph 10, by a written addendum or amendment signed by you and us, or by reasonable changes of our rules allowed under paragraph 18. If, at least 5 days before the advance notice deadline referred to in paragraph 3, we give you written notice of rent increases or Lease Contract changes effective when the Lease Contract term or renewal period ends, this Lease Contract will automatically continue month-to-month with the increased rent or Lease Contract changes. The new modified Lease Contract will begin on the date stated in the notice (without necessity of your signature) unless you give us written move-out notice under paragraph 37. The written move-out notice under paragraph 37 applies only to the end of the current Lease Contract or renewal period.

16. **DELAY OF OCCUPANCY.** If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for the delay. The Lease Contract will remain in force subject to: (1) abatement of rent on a daily basis during delay; and (2) your right to terminate as set forth below. Termination notice must be in writing. After termination, you are entitled only to refund of deposit(s) and any rent paid. Rent abatement or Lease Contract termination does not apply if delay is for cleaning or repairs that don't prevent you from occupying the dwelling.

If there is a delay and we haven't given notice of delay as set forth immediately below, you may terminate up to the date when the dwelling is ready for occupancy, but not later.

(1) If we give written notice to any of you when or after the Lease Contract begins—and the notice states that occupancy has been delayed because of construction or a previous resident's holding over, and that the dwelling will be ready on a specific date—you may terminate the Lease Contract within 3 days of your receiving the notice, but not later.

(2) If we give written notice to any of you before the effective Lease Contract date and the notice states that construction delay is expected and that the dwelling will be ready for you to occupy on a specific date, you may terminate the Lease Contract within 7 days after any of you receives written notice, but not later. The readiness date is considered the new effective Lease Contract date for all purposes. This new date may not be moved to an earlier date unless we and you agree.

17. **DISCLOSURE RIGHTS.** If someone requests information on you or your rental history for law-enforcement, governmental, or business purposes, we may provide it. At our request, any utility provider may furnish us information about pending or actual connections or disconnections of utility service to your dwelling.

## While You're Living in the Dwelling

18. **POLICIES OR RULES.** You and all guests and occupants must comply with any written rules and policies, including instructions for care of our property. Our rules are considered part of this contract. We may make reasonable changes to written rules, effective immediately upon their distribution to you. These changes must not change any dollar amounts on page 1 of this Lease Contract. You must comply with any subdivision or deed restrictions that apply.

19. **LIMITATIONS ON CONDUCT.** The dwelling and other areas reserved for your private use must be kept clean. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. Any swimming pools, spas, storerooms, and similar areas must be used with care in accordance with our rules and posted signs. Glass containers are prohibited in or near pools. You, your occupants, or guests may not anywhere in the dwelling or outside areas use candles or kerosene lamps or heaters without our prior written approval, or solicit business or contributions. Conducting any kind of business (including child care services) in your dwelling is prohibited—except that any lawful business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your dwelling for business purposes. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) activities in outside areas.

We may exclude from the property guests or others who, in our judgment, have been violating the law, violating this Lease Contract or any of our rules, or disturbing other persons, neighbors, visitors, or owner representatives. We may also exclude from any outside area a person who refuses to show photo identification or refuses to identify himself or herself as a resident, occupant, or guest of a specific resident.

You will notify us within 15 days if you or any occupants are convicted of any felony, or misdemeanor involving a controlled substance, violence to another person or destruction of property. You also agree to notify us within 15 days if you or any occupants register as a sex offender in any state. Informing us of criminal convictions or sex offender registry does not waive any rights we have against you.

20. **PROHIBITED CONDUCT.** You and your occupants or guests may not engage in the following activities: criminal conduct; behaving in a loud or obnoxious manner; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the dwelling; disrupting our business operations; manufacturing, delivering, or possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the

36

dwelling; displaying or possessing a gun, ~~~~other weapon in or near the dwelling in a way that may alarm oth~~~~ ~~~~oring anything in closets having gas appliances; tampering with utilities or telecommunications; bringing hazardous materials into the dwelling; using windows for entry or exit; heating the dwelling with a gas-operated cooking stove or oven; or injuring our reputation by making bad faith allegations against us to others.

21. **PARKING.** We may regulate the time, manner, and place of parking all cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles. Motorcycles or motorized bikes may not be parked inside a dwelling or on sidewalks. We may have unauthorized or illegally parked vehicles towed or booted according to state law at the owner or operator's expense at any time if it:

(1) has a flat tire or is otherwise inoperable
(2) is on jacks, blocks or has wheel(s) missing
(3) takes up more than one parking space, if the dwelling complex has more than one living unit
(4) belongs to a resident or occupant who has surrendered or abandoned the dwelling
(5) blocks another vehicle from exiting
(6) is in a fire lane or designated "no parking" area
(7) is in a space marked for other resident(s) or dwelling(s)
(8) is in any portion of a yard area
(9) is on the grass, sidewalk, or patio, or
(10) has no current license, registration or inspection sticker, and we give you at least 10 days notice that the vehicle will be towed if not removed.

22. **RELEASE OF RESIDENT.** Unless you're entitled to terminate this Lease Contract under paragraphs 10, 16, 23, 31 or 37, you won't be released from this Lease Contract for any reason — including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, bad health, death, or property purchase. You may also have the right under Texas law to terminate the Lease Contract in certain situations involving family violence or sexual assault.

**Death of Sole Resident.** If you are the sole resident and die during the Lease Contract term, the Lease Contract may be terminated without penalty by an authorized representative of your estate with at least 30 days written notice. Your estate will be liable for payment of rent until the latter of: (1) the termination date, or (2) until all possessions in the apartment are removed. Your estate will also be liable for all charges and damages to the apartment until it is vacated, and any removal and storage costs.

23. **MILITARY PERSONNEL CLAUSE.** You may have the right under Texas law to terminate the Lease Contract in certain situations involving military deployment or transfer. You may terminate the Lease Contract if you enlist or are drafted or commissioned in the U.S. Armed Forces. You also may terminate the Lease Contract if:

(1) you are (i) a member of the U.S. Armed Forces or reserves on active duty or (ii) a member of the National Guard called to active duty for more than 30 days in response to a national emergency declared by the President; *and*
(2) you (i) receive orders for permanent change-of-station, (ii) receive orders to deploy with a military unit or as an individual in support of a military operation for 90 days or more, *or* (iii) are relieved or released from active duty.

After you deliver to us your written termination notice, the Lease Contract will be terminated under this military clause 30 days after the date on which your next rental payment is due. You must furnish us a copy of your military orders, such as permanent change-of-station orders, call-up orders, or deployment orders or letter. Military permission for base housing doesn't constitute a permanent change-of-station order. After your move out, we'll return your security deposit, less lawful deductions. For the purposes of this Lease Contract, orders described in (2) above will only release the resident who qualifies under (1) and (2) above and receives the orders during the Lease Contract term and such resident's spouse or legal dependents living in the resident's household. A co-resident who is not your spouse or dependent cannot terminate under this military clause. Unless you state otherwise in paragraph 10, you represent when signing this Lease Contract that: (1) you do not already have deployment or change-of-station orders; (2) you will not be retiring from the military during the Lease Contract term; and (3) the term of your enlistment or obligation will not end before the Lease Contract term ends. Liquidated damages for making a false representation of the above will be the amount of unpaid rent for the remainder of the lease term when and if you move out, less rents from others received in mitigation under paragraph 32. You must immediately notify us if you are called to active duty or receive deployment or permanent change-of-station orders.

24. **RESIDENT SAFETY AND LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of smoke alarms and other detection devices, door and window locks, and other safety or security devices. You agree to make every effort to follow the Security Guidelines on page 5. Window screens are not for security or keeping people from falling out.

**Alarms and Detection Devices.** We'll furnish smoke alarms or other detection devices required by statute, and we'll test them and provide working batteries when you first take possession. After that, you must pay for and replace batteries as needed, unless the law provides otherwise. We may replace dead or missing batteries at your expense, without prior notice to you. You must immediately report alarm or detector malfunctions to us. Neither you nor others may disable alarms or detectors. *If you damage or disable the smoke alarm or remove a battery without replacing it with a working battery, you may be liable to us under Section 92.2611 of the Property Code for $100 plus one month's rent, actual damages, and attorney's fees.* You also will be liable to us and others if you fail to report malfunctions, or any loss, damage, or fines resulting from your failure to report malfunctions. Upon request, we will provide, as required by law, a smoke alarm capable of alerting a person with a hearing-impairment disability.

**Loss.** We're not liable to any resident, guest, or occupant for personal injury or damage or loss of personal property or business or personal income from any cause including but not limited to fire, smoke, rain, flood, water leaks, hail, ice, snow, lightning, wind, explosions, interruption of utilities, pipe leaks, theft, negligent or intentional acts of residents, occupants, or guests, or vandalism unless otherwise required by law. We have no duty to remove any ice, sleet, or snow but may remove any amount with or without notice. Unless we instruct otherwise, you must—for 24 hours a day during freezing weather—(1) keep the dwelling heated to at least 50 degrees; (2) keep cabinet and closet doors open; and (3) drip hot and cold water faucets. You'll be liable for damage to our and others' property if damage is caused by broken water pipes due to your violating these requirements.

**Crime or Eme~~~~y.** Dial 911 or immediately call local medical emergency, fire, ~~~~ce personnel in case of accident, fire, smoke, suspected criminal activity, or other emergency involving imminent harm. You should then contact our representative. You won't treat any of our security measures as an express or implied warranty of security, or as a guarantee against crime or of reduced risk of crime. Unless otherwise provided by law, we're not liable to you or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. Even if previously provided, we're not obligated to furnish security personnel, patrols, lighting, gates or fences, or other forms of security unless required by statute. We're not responsible for obtaining criminal history checks on any residents, occupants, guests, or contractors in the dwelling. If you or any occupant or guest is affected by a crime, you must make a written report to our representative and to the appropriate local law-enforcement agency. You also must furnish us with the law-enforcement agency's incident report number upon request.

25. **CONDITION OF THE PREMISES AND ALTERATIONS.** You accept the dwelling, fixtures, and furniture as is, except for conditions materially affecting the health or safety of ordinary persons. We disclaim all implied warranties. You'll be given an Inventory & Condition form on or before move-in. Within 48 hours after move-in, you must sign and note on the form all defects or damage and return it to us. Otherwise, everything will be considered to be in a clean, safe, and good working condition.

You must use customary diligence in maintaining the dwelling and not damaging or littering the outside areas. Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the dwelling. We'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and grooves of wood-paneled walls, unless our rules state otherwise. No water furniture, extra phone or television outlets, alarm systems, or lock changes, additions, or rekeying is permitted unless allowed by statute or we've consented in writing. You may install a satellite dish or antenna provided you sign our satellite dish or antenna lease addendum which complies with reasonable restrictions allowed by federal law. You agree not to alter, damage, or remove our property, including alarm systems, detection devices, furniture, telephone and television wiring, screens, locks, and security devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the dwelling; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the dwelling (whether or not we consent) become ours unless we agree otherwise in writing.

We are committed to the principles of fair housing. In accordance with fair housing laws, we will make reasonable accommodations to our rules, policies, practices or services, and/or will allow reasonable modifications under such laws to give persons with disabilities access to and use of the dwelling. We may require you to sign an addendum regarding the approval and implementation of such accommodations or modifications, as well as restoration obligations, if any.

26. **REQUESTS, REPAIRS, AND MALFUNCTIONS.** We'll maintain the dwelling in good order and pay for repair and maintenance, subject to the repair procedures set forth below. You must replace air-conditioning filters monthly and keep the yard clean.

**Procedures for Repairs by Us.** *If you or any occupant needs to send a notice or request—for example, for repairs, installations, services, ownership disclosure or security-related matters—IT MUST BE SIGNED AND IN WRITING to our designated representative* (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, crime in progress, or fair housing accommodation or modification). Our written notes on your oral request do not constitute a written request from you.

Our complying with or responding to any oral request regarding security or non-security matters doesn't waive the strict requirement for written notices under this Lease Contract. You must promptly notify us in writing of: water leaks; mold; electrical problems; malfunctioning lights; broken or missing locks or latches; and other conditions that pose a hazard to property, health, or safety. We may change or install utility lines or equipment serving the dwelling if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify us immediately. Air conditioning problems are normally not emergencies. If air conditioning or other equipment malfunctions, you must notify us as soon as possible on a business day. We'll act with customary diligence to make repairs and reconnections, taking into consideration when casualty insurance proceeds are received. Rent will not abate in whole or in part.

If we believe that fire or catastrophic damage is substantial, or that performance of needed repairs poses a danger to you, we may terminate this Lease Contract by giving you at least 5 days written notice. We may also remove personal property if it causes a health or safety hazard. If the Lease Contract is so terminated, we'll refund prorated rent and all deposits, less lawful deductions.

**Repairs and Service Calls.** We will pay for repairs of conditions that materially affect the health or safety of an ordinary resident (i.e. dangerous or hazardous conditions). Otherwise, you'll be responsible for the first $___0___ of any repair or service call.

**Yard Maintenance.** Unless we expressly assume the responsibility below, you must pay for yard maintenance and yard pest control.
(1) Who will keep the lawn mowed and edged, and maintain all plants, trees, shrubs, etc.? ☑ You or ☐ Us
(2) Who will water the lawn and other vegetation? ☑ You or ☐ Us
(3) Who will keep the lawn, flowerbeds, sidewalks, porches, and driveways free of trash and debris? ☑ You or ☐ Us
(4) Who is obligated to fertilize lawn and plants?
☐ You ☐ Us or ☑ Neither
You must promptly report infestations or dying vegetation to us. You may not modify the existing landscape, change any plants, or plant a garden without our prior written approval.

**Interior Pest Control and Trash Receptacles.** Unless paragraph 10 says otherwise, we'll arrange and pay for extermination services for all pests within the dwelling, as needed in our reasonable judgment.
(1) Who will initially pay for outside trash receptacles for your use?
☐ You ☐ Us ☐ City Utility or ☑ Other
(2) If we pay for trash receptacles initially, who must repair or replace them if they're broken or missing? ☐ You or ☐ Us ☑ N/A

Trash receptacles must be kept closed, and... ...t comply with local ordinances regarding trash disposal. We may designate which trash receptacles will be stored on the premises and where they'll be.

**27. ANIMALS.** *No animals (including mammals, reptiles, birds, fish, rodents, amphibians, arachnids, and insects) are allowed, even temporarily, anywhere in the dwelling, porches, patios, balconies, or yards (unless we've so authorized in writing.* If we allow an animal, you must sign a separate animal addendum and pay an animal deposit. An animal deposit is considered a general security deposit. We will authorize a support animal for a disabled person but will not require an animal deposit. We may require a written statement from a qualified professional verifying the need for the support animal. You must not feed stray or wild animals or allow unauthorized animals to be tied to any porch, tree, or other object on the premises at any time.

If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease Contract. If an animal has been in the dwelling at any time during your term of occupancy (with or without our consent), we'll charge you for all cleaning and repair costs, including defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except for attorney's fees and litigation costs) in enforcing animal restrictions and rules. We may remove an unauthorized animal by (1) leaving, in a conspicuous place in the dwelling, a 24-hour written notice of intent to remove the animal, and (2) following the procedures of paragraph 28. We may keep or kennel the animal or turn it over to a humane society or local authority. When keeping or kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. We'll return the animal to you upon request if it has not already been turned over to a humane society or local authority. You must pay for the animal's reasonable care and kenneling charges. We have no lien on the animal for any purpose.

**28. WHEN WE MAY ENTER.** If you or any guest or occupant is present, then repairers, servicers, contractors, our representatives, or other persons listed in (2) below may peacefully enter the dwelling at reasonable times for the purposes listed in (2) below. If nobody is in the dwelling, then such persons may enter peacefully and at reasonable times by duplicate or master key (or by breaking a window or other means when necessary) if:
(1)    written notice of the entry is left in a conspicuous place in the dwelling immediately after the entry; *and*
(2)    entry is for: responding to your request; making repairs or

replacements... ...ting; repair or refurbishing costs; performing pest control; doing preventive maintenance; checking for water leaks; changing filters, testing or replacing detection or alarm devices or batteries, retrieving unreturned tools, equipment, or appliances, preventing waste of utilities, exercising our contractual lien; leaving notices; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or security devices, removing or rekeying unauthorized security devices; removing unauthorized window coverings; stopping excessive noise; removing health or safety hazards (including hazardous materials), or items prohibited under our rules; removing perishable foodstuffs if your electricity is disconnected; removing unauthorized animals; disconnecting utilities involving bona fide repairs, emergencies or construction; retrieving property owned or leased by former residents; inspecting when immediate danger to person or property is reasonably suspected; allowing persons to enter as you authorized in your rental application (if you die, are incarcerated, etc.); allowing entry by a law officer with a search or arrest warrant, or in hot pursuit; showing dwelling to prospective residents (after move-out or vacate notice has been given); or showing the dwelling to government representatives for the limited purpose of determining housing and fire ordinance compliance, and to lenders, appraisers, contractors, prospective buyers, or insurance agents.

**29. MULTIPLE RESIDENTS OR OCCUPANTS.** Each resident is jointly and severally liable for all Lease Contract obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. Notices and requests from any resident or occupant constitute notice from all residents. Your notice of Lease Contract termination may only be given by residents. In eviction suits, each resident is considered the agent of all other residents in the dwelling for service of process. Any resident who defaults under this Lease Contract will indemnify the non-defaulting residents and their guarantors.

Security deposit refund check and any deduction itemizations will be by: *(check one):* ☐ one check jointly payable to all residents and mailed to any one resident we choose, OR
☑ one check payable and mailed to ___Lori Keaton___
_____ *(specify name of one resident).*

*If neither is checked, then the refund will be made in one check jointly payable to all residents.*

---

## Replacements

**30. REPLACEMENTS AND SUBLETTING.** Replacing a resident, subletting, or assignment is allowed *only when we consent in writing.* If departing or remaining residents find a replacement resident acceptable to us before moving out and we expressly consent to the replacement, subletting, or assignment, then:
(1)    a reletting charge *will not* be due;
(2)    a reasonable administrative (paperwork) fee *will* be due, and a rekeying fee *will* be due if rekeying is requested or required; and
(3)    the departing and remaining residents *will* remain liable for all Lease Contract obligations for the rest of the original Lease Contract term.

**Procedures for Replacement.** If we approve a replacement resident, then, at our option: (1) the replacement resident must sign this Lease Contract with or without an increase in the total security deposit; or (2) the remaining and replacement residents must sign an entirely new Lease Contract. Unless we agree otherwise in writing, your security deposit will automatically transfer to the replacement resident as of the date we approve. The departing resident will no longer have a right to occupancy or a security-deposit refund, but will remain liable for the remainder of the original Lease Contract term unless we agree otherwise in writing—even if a new Lease Contract is signed.

---

## Responsibilities of Owner and Resident

**31. RESPONSIBILITIES OF OWNER.** We'll act with customary diligence to:
(1)    maintain fixtures, hot water, heating, and A/C equipment;
(2)    substantially comply with all applicable laws regarding safety, sanitation, and fair housing; and
(3)    make all reasonable repairs, subject to paragraph 26 and your obligation to pay for damages for which you are liable.

If we violate any of the above, you may possibly terminate this Lease Contract and exercise other remedies under Texas Property Code Section 92.056 by following this procedure;
(a)    all rent must be current and you must make a written request for repair or remedy of the condition—after which we'll have a reasonable time for repair or remedy;
(b)    if we fail to do so, you must make a second written request for the repair or remedy (to make sure that there has been no miscommunication between us)—after which we'll have a reasonable time for the repair or remedy; and
(c)    if the repair or remedy still hasn't been accomplished within that reasonable time period, you may immediately terminate this Lease Contract by giving us a final written notice. You also may exercise other statutory remedies, including those under Texas Property Code Section 92.0561.

Instead of giving the two written requests referred to above, you may give us one request by certified mail, return receipt requested, or by registered mail—after which we will have a reasonable time for repair or remedy. "Reasonable time" takes into account the nature of the problem and the reasonable availability of materials, labor, and utilities. Your rent must be current at the time of any request. We will refund security deposits and prorated rent as required by law.

**32. DEFAULT BY RESIDENT.** You'll be in default if: (1) you don't pay rent or other amounts that you owe on time; (2) you or any guest or occupant violates this Lease Contract, our rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (3) you abandon the dwelling; (4) you give incorrect or false answers in a rental application; (5) you or any occupant is arrested, charged, detained, convicted, or given deferred adjudication or pretrial diversion for (i) a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marihuana, or drug paraphernalia as defined in the Texas Controlled Substances Act, or (ii) any sex-related crime, including a misdemeanor; (6) any illegal drugs or paraphernalia are found in your dwelling; or (7) you or any occupant, in bad faith, makes an invalid habitability complaint to an official or employee of a utility company or the government.

**Eviction.** *If you default or holdover, we may end your right of occupancy by giving you a 24-hour written notice to vacate.* Notice may be by: (1) regular mail; (2) certified mail, return receipt requested; (3) personal delivery to any resident; (4) personal delivery at the dwelling to any occupant over 16 years old; or (5) affixing the notice to the inside of the dwelling's main entry door. Notice by mail only will be considered delivered on the earlier of: (1) actual delivery, or (2) three days (not counting Sundays or federal holidays) after the notice is deposited in the U.S. Postal Service with postage. Termination of your possession rights or subsequent reletting doesn't release you from liability for future rent or other Lease Contract obligations. After giving

notice to vacate or filing an eviction suit, we may still accept rent or other sums due; the filing or acceptance doesn't waive or diminish our right of eviction, or any other contractual or statutory right. Accepting money at any time doesn't waive our right to damages; past or future rent, or other sums; or to continue with eviction proceedings.

**Acceleration.** All monthly rent for the rest of the Lease Contract term or renewal period will be accelerated automatically without notice or demand (before or after acceleration) and will be immediately due and delinquent if, without our written consent: (1) you move out, remove property in preparing to move out, or give oral or written notice (by you or any occupant) of intent to move out before the Lease Contract term or renewal period ends; and (2) you've not paid all rent for the entire Lease Contract term or renewal period. Such conduct is considered a default for which we need not give you notice. Remaining rent also will be accelerated if you're judicially evicted or move out when we demand because you've defaulted. Acceleration is subject to our mitigation obligations below.

**Holdover.** You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then: (1) holdover rent is due in advance on a daily basis and may become delinquent without notice or demand; (2) rent for the holdover period will be increased by 25% over the then-existing rent, without notice; (3) you'll be liable to us (subject to our mitigation duties) for all rent for the full term of the previously signed Lease Contract of a new resident who can't occupy because of the holdover; and (4) at our option, we may extend the Lease Contract term—for up to one month from the date of notice of Lease Contract extension—by delivering written notice to you or your dwelling while you continue to hold over.

**Other Remedies.** We may report unpaid amounts to credit agencies. If you default and move out early, you will pay us any amounts stated to be rental discounts or concessions agreed to in writing, in addition to other sums due. Upon your default, we have all other legal remedies, including Lease Contract termination and statutory lockout under Section 92.0081, Texas Property Code, except as lockouts and liens are prohibited by Section 2306.6736, Texas Government Code, for owners supported by housing tax credit allocations. A prevailing party may recover reasonable attorney's fees and all other litigation costs from the non-prevailing parties, except a party may not recover attorney's fees and litigation costs in connection with a party's claims seeking personal injury, sentimental, exemplary or punitive damages. We may recover attorneys' fees in connection with enforcing our rights under this Lease Contract. You agree that late charges are liquidated damages and a reasonable estimate of such damages for our time, inconvenience, and overhead associated with collecting late rent (but are not for attorney's fees and litigation costs). All unpaid amounts you owe, including judgments, bear 18% interest per year from due date, compounded annually. You must pay all collection-agency fees if you fail to pay all sums due within 10 days after we mail you a letter demanding payment and stating that collection agency fees will be added if you don't pay all sums by that deadline.

**Mitigation of Damages.** If you move out early, you'll be subject to paragraph 11 and all other remedies. We'll exercise customary diligence to relet and minimize damages. We'll credit all subsequent rent that we actually receive from replacement or subsequent residents against your liability for past-due and future rent and other sums due. PAGE 4 OF 6

**33. MISCELLANEOUS.** *Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement between you and us. Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing.* No action or omission by us will be considered a waiver of our rights or of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, acceleration, liens, or other rights isn't a waiver under any circumstances. Except when notice or demand is required by statute, you waive any notice and demand for performance from us if you default. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should retain a copy of the memo, letter, or fax that was given, as well as any fax transmittal verification. Fax or electronic signatures are binding. All notices must be signed. Notices may **not** be given by email or other electronic transmission.

Exercising one remedy won't constitute an election or waiver of other remedies. Insurance subrogation is waived by all parties. All remedies are cumulative. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf. This Lease Contract binds subsequent owners. Neither an invalid clause nor the omission of initials on any page invalidates this Lease Contract. All notices and documents may be in English and, at our option, in any language that you read or speak. All provisions regarding our non-liability and non-duty apply to our employees, agents, and management companies. This Lease Contract is subordinate to existing and future recorded mortgages, unless the owner's lender chooses otherwise. All Lease Contract obligations must be performed in the county where the dwelling is located.

We may deactivate or not install keyless bolting devices on your doors if: (1) you or an occupant in the dwelling is over 55 or disabled, and (2) the requirements of Section 92.153(e) or (f), Texas Property Code are satisfied.

Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-operated lighting.

**34. PAYMENTS.** Payment of all sums is an independent covenant. At our option and without notice, we may apply money received (other than sale proceeds under paragraph 13 or utility payments subject to government regulation) first to any of your unpaid obligations, then to current rent—regardless of notations on checks or money orders and regardless of when the obligations arose. All sums other than rent are due upon our demand. After the due date, we do not have to accept the rent or any other payments.

**35. TAA MEMBERSHIP.** We represent that, at the time of signing this Lease Contract: (1) we; (2) the management company that represents us; or (3) any locator service that procured you is a member in good standing of both the Texas Apartment Association and the affiliated local apartment association for the area where the dwelling is located. The member is either an owner/management company member or an associate member doing business as a locator service (whose name and address must be disclosed on page 6). If not, the following applies: (1) this Lease Contract is voidable at your option and is unenforceable by us (except for property damages); and (2) we may not recover past or future rent or other charges. The above remedies also apply if both of the following occur: (1) the Lease Contract is automatically renewed on a month-to-month basis two or more times after membership in TAA and the local association has lapsed; and (2) neither the owner nor the management company is a member of TAA and the local association at the time of the third automatic renewal. A signed affidavit from the local affiliated apartment association which attests to non-membership when the Lease Contract or renewal was signed will be conclusive evidence of non-membership. Governmental entities may use TAA forms if TAA agrees in writing.

---

**36. SECURITY GUIDELINES.** We care about your safety and that of other occupants and guests. *No security system is failsafe. Even the best system can't prevent crime. Always act as if security systems don't exist since they are subject to malfunction, tampering, and human error. We disclaim any express or implied warranties of security. The best safety measures are the ones you perform as a matter of common sense and habit.*

Inform all other occupants in your dwelling, including any children you may have, about these guidelines. We recommend that all residents and occupants use common sense and follow crime prevention tips, such as those listed below:

- In case of emergency, call 911. Always report emergencies to authorities first and then contact the management.
- Report any suspicious activity to the police first, and then follow up with a written notice to us.
- Know your neighbors. Watching out for each other is one of the best defenses against crime.
- Always be aware of your surroundings and avoid areas that are not well-traveled or well-lit.
- Keep your keys handy at all times when walking to your car or home.
- Do not go inside if you arrive home and find your door open. Call the police from another location and ask them to meet you before entering.
- Make sure door locks, window latches and sliding glass doors are properly secured at all times.
- Use the keyless deadbolt in your dwelling when you are at home.
- Don't put your name or address on your key ring or hide extra keys in obvious places, like under a flower pot. If you lose a key or have concerns about key safety, we will rekey your locks at your expense, in accordance with paragraph 9 of the Lease Contract.

- Check the door viewer before answering the door. Don't open the door if you don't know the person or have any doubts. Children who are old enough to take care of themselves should never let anyone inside when home without an adult.
- Regularly check your security devices, smoke alarms and other detection devices to make sure they are working properly. Alarm and detection device batteries should be tested monthly and replaced at least twice a year.
- Immediately report in writing (dated and signed) to us any needed repairs of security devices, doors, windows, smoke alarms and other detection devices, as well as any other malfunctioning safety devices on the property, such as broken access gates, burned out exterior lights, etc.
- If your doors or windows are not secure due to a malfunction or break-in, stay with a friend or neighbor until the problem is fixed.
- When you leave home, make sure someone knows where you're going and when you plan to be back.
- Lock your doors and leave a radio or TV playing softly while you're gone. Close curtains, blinds and window shades at night.
- While gone for an extended period, secure your home and use lamp timers. Also stop all deliveries (such as newspaper and mail) or have these items picked up daily by a friend.
- Know at least two exit routes from your home, if possible.
- Don't give entry keys, codes or gate access cards to anyone.
- Always lock the doors on your car, even while driving. Take the keys and remove or hide any valuables. Park your vehicle in a well-lit area.
- Check the backseat before getting into your car. Be careful stopping at gas stations or automatic-teller machines at night — or anytime when you suspect danger.

There are many other crime prevention tips readily available from police departments and others.

---

**37. MOVE-OUT NOTICE.** Before moving out, you must give our representative advance written move-out notice as provided below. Your move-out notice will not release you from liability for the full term of the Lease Contract or renewal term. You will still be liable for the entire Lease Contract term if you move out early (paragraph 22) except under paragraphs 10, 16, 22, 23 or 31). YOUR MOVE-OUT NOTICE MUST COMPLY WITH EACH OF THE FOLLOWING:

- We must receive advance written notice of your move-out date. The advance notice must be at least the number of days of notice required in paragraph 3 or in special provisions—even if the Lease Contract has become a month-to-month lease. If a move-out notice is received on the first, it will suffice for move-out on the last day of the month of intended move-out, provided that all other requirements below are met.
- The move-out date in your notice *[check one]:* ❑ must be the last day of the month; or ❑ may be the exact day designated in your notice. *If neither is checked, the second applies.*

- Your move-out notice must be in writing. Oral move-out notice will not be accepted and will not terminate your Lease Contract.
- Your move-out notice must not terminate the Lease Contract sooner than the end of the Lease Contract term or renewal period.
- If we require you to give us more than 30 days written notice to move out before the end of the Lease Contract term, we will give you a written reminder not less than 5 days nor more than 90 days before your deadline for giving us your written move-out notice. If we fail to provide a reminder notice, 30 days written notice to move-out is required.

YOUR NOTICE IS NOT ACCEPTABLE IF IT DOES NOT COMPLY WITH ALL OF THE ABOVE. We recommend you use our written move-out form to ensure you provide the information needed. You must obtain from us written acknowledgment that we received your move-out notice. If we terminate the Lease Contract, we must give you the same advance notice—unless you are in default.

39

**38. MOVE-OUT PROCEDURES.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the Lease Contract term or renewal period ends unless all rent for the entire Lease Contract term or renewal period is paid in full. Early move-out may result in reletting charges and acceleration of future rent under paragraphs 11 and 32. You're prohibited by law from applying any security deposit to rent. You won't stay beyond the date you are supposed to move out. All residents, guests, and occupants must surrender or abandon the dwelling before the 30-day period for deposit refund begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

**39. CLEANING.** You must thoroughly clean the dwelling, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage areas. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges—including charges for cleaning carpets, draperies, furniture, walls, etc. that are soiled beyond normal wear (that is, wear or soiling that occurs without negligence, carelessness, accident, or abuse).

**40. MOVE-OUT INSPECTION.** You should meet with our representative for a move-out inspection. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final refunding or accounting.

**41. SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** You'll be liable for the following charges, if applicable: unpaid rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the dwelling and is missing; replacing dead or missing alarm or detection device batteries at any time; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone, Internet, or television services or rental items (if you so request or have moved out); trips to open the dwelling when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized security devices or alarm systems; agreed reletting charges; packing, removing, or storing property removed or stored under paragraph 13; removing or booting illegally parked vehicles; false security-alarm charges unless due to our negligence; animal-related charges under paragraphs 6 and 27;

government fees or fines against us for violation (by you, your occupants, or guests) of local ordinances relating to alarms and detection devices, false alarms, recycling, or other matters; late-payment and returned-check charges; a charge (not to exceed $100) for our time and inconvenience in our lawful removal of an animal or in any valid eviction proceeding against you, plus attorney's fees, court costs, and filing fees actually paid; and other sums due under this Lease Contract.

You'll be liable to us for: (1) charges for replacing all keys and access devices listed in paragraph 5 if you fail to return them on or before your actual move-out date; (2) accelerated rent if you have violated paragraph 32; and (3) a reletting fee if you have violated paragraph 11.

**42. DEPOSIT RETURN, SURRENDER, AND ABANDONMENT.** We'll mail you your security deposit refund (less lawful deductions) and an itemized accounting of any deductions no later than 30 days after surrender or abandonment, unless statutes provide otherwise.

You have *surrendered* the dwelling when: (1) the move-out date has passed and no one is living in the dwelling in our reasonable judgment; or (2) dwelling keys and access devices listed in paragraph 5 have been turned in to us—whichever date occurs first.

You have *abandoned* the dwelling when all of the following have occurred: (1) everyone appears to have moved out in our reasonable judgment; (2) clothes, furniture, and personal belongings have been substantially removed in our reasonable judgment; (3) you've been in default for non-payment of rent for 5 consecutive days, or water, gas, or electric service for the dwelling not connected in our name has been terminated or transferred, and (4) you've not responded for 2 days to our notice left on the inside of the main entry door, stating that we consider the dwelling abandoned. A dwelling is also "abandoned" 10 days after the death of a sole resident.

Surrender, abandonment, or judicial eviction ends your right of possession for all purposes and gives us the immediate right to clean up, make repairs in, and relet the dwelling; determine any security deposit deductions; and remove property left in the dwelling. Surrender, abandonment, and judicial eviction affect your rights to property left in the dwelling (paragraph 13), but do not affect our mitigation obligations (paragraph 32).

---

## Signatures, Originals and Attachments

**43. ORIGINALS AND ATTACHMENTS.** This Lease Contract has been executed in multiple originals, each with original signatures—one for you and one or more for us. Our rules and policies, if any, will be attached to the Lease Contract and given to you at signing. When an Inventory and Condition form is completed, both you and we should retain a copy. The items checked below are attached to and become a part of this Lease Contract and are binding even if not initialed or signed:

☐ Access Gate Addendum
☐ Additional Special Provisions
☐ Allocation Addendum for: ☐ electricity ☐ water ☐ gas
   ☐ central system costs  ☐ trash/recycling  ☐ cable/satellite
   ☐ stormwater/drainage   ☐ services/government fees
☐ Animal Addendum
☐ Asbestos Addendum (if asbestos is present)
☐ Bed Bug Addendum
☐ Early Termination Addendum
☐ Enclosed Garage, Carport or Storage Unit Addendum
☑ Inventory & Condition Form
☐ Intrusion Alarm Addendum
☐ Lead Hazard Information and Disclosure Addendum
☐ Lease Contract Guaranty (_____ guaranties, if more than one)
☐ Legal Description of Dwelling (optional, if rental term longer than one year)
☐ Military SCRA Addendum
☐ Mold Information and Prevention Addendum
☐ Move-Out Cleaning Instructions
☐ Notice of Intent to Move Out Form
☑ Owner's Rules or Policies
☐ Parking Permit or Sticker (quantity: _____)
☐ Rent Concession Addendum
☐ Renter's or Liability Insurance Addendum
☐ Repair or Service Request Form
☐ Satellite Dish or Antenna Addendum
☐ TCEQ Tenant Guide to Water Allocation
☐ Utility Submetering Addendum for: ☐ electricity ☐ water ☐ gas
☑ Other  Drug Free Housing
☐ Other _____

*Name, address and telephone number of locator service (if applicable—must be completed to verify TAA membership under paragraph 35):*

_____

_____

---

> You are legally bound by this document. Please read it carefully.
>
> Before submitting a rental application or signing a Lease Contract, you may take a copy of these documents to review and/or consult an attorney.
>
> Additional provisions or changes may be made in the Lease Contract if agreed to in writing by all parties.
>
> You are entitled to receive an original of this Lease Contract after it is fully signed. Keep it in a safe place.

*Resident or Residents (all sign below)*

_Teri Heaton_     4/12/14
                  Date signed

_____
Date signed

_____
Date signed

_____
Date signed

*Owner or Owner's Representative (signing on behalf of owner)*

_Linda Nowlin_

*Address and phone number of owner's representative for notice purposes*

512-971-1793

linda.nowlin @ nowlinproperties .com

*After-hours phone number* _____

*(Always call 911 for police, fire or medical emergencies.)*

*Date form is filled out (same as on top of page 1)* _____

40